# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LARRY RUSH, | : | |
| | : | Civil Action No. 08-4843 |
| Petitioner, | : | |
| | : | CAPITAL CASE |
| v. | : | |
| | : | **OPINION** |
| JEFFREY BEARD, *et al.*, | : | |
| | : | |
| Respondents. | : | |
| | : | |

APPEARANCES:

Jennifer L. Givens, Esq.
Cristi Charpentier, Esq.
Federal Community Defender Office
For the Eastern District of Pennsylvania
Capital Habeas Corpus Unit,
Curtis Bldg., Suite 545 West
Independence Square West
Philadelphia, PA 19106
               On behalf of Petitioner

John W. Goldsborough, Esq.
Thomas W. Dolgenos, Esq.
District Attorney's Office
Federal Litigation Unit
Three South Penn Square
Philadelphia, PA 19107-3499
               On behalf of Respondents

**RODRIGUEZ**, District Judge[1]

---

[1] On May 4, 2011, pursuant to 28 U.S.C. § 292(b), the Third Circuit Court of Appeals designated the undersigned to handle Petitioner's habeas petition. (Designation of District Judge for Service in Another District Within the Circuit, ECF No. 91.)

This matter comes before the Court upon the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 by Petitioner Larry Rush ("Petitioner"), an inmate sentenced to death and confined at SCI-Greene in Waynesburg, Pennsylvania. (Pet., ECF No. 1.) On December 14, 2010, Petitioner filed his "Memorandum of Law in Support of Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254." ("Petr's Mem.," ECF No. 86.) Respondents filed their "Response to Petition for Writ of Habeas Corpus" on October 26, 2011. ("Respondents' Brief," ECF No. 105.) Petitioner filed "Petitioner's Reply in Further Support of Pet. for Writ of Habeas Corpus" on July 16, 2012. ("Petr's Reply," ECF No. 116.) Respondents filed "Sur-reply to Petitioner's Reply" on September 6, 2012. ("Respondents' Sur-reply," ECF No. 118.) Pursuant to Federal Rule of Civil Procedure 78, the Court now decides the petition on the record and briefs, however, reserving Ground Nine of the petition for determination after an evidentiary hearing. For the reasons discussed below, the Court affirms the conviction.

I.    FACTUAL BACKGROUND

On June 28, 1988, a jury convicted Petitioner of committing murder on May 8, 1987, in Philadelphia, Pennsylvania. (Respondents' Brief, Ex. L, ECF 105-57 at 121-22.)[2] The trial was held in the former Career Criminal Program of the Court of Common Pleas of Philadelphia, presided over by the Honorable James D. McCrudden. (*Id.* at 31.) Judge McCrudden had also presided over two criminal cases against Petitioner, which were "aggravator cases" with respect to the death penalty in this matter; sexual assault and robbery of Annamay Little and Denise Kellar on April 15, 1987, in a Rittenhouse Square florist shop; and the stabbing of Edna Nitterauer on May 4, 1987, in a Chestnut Hill bookstore. (*Id.* at 22-24 and n. 11, 12.) On direct appeal of

---

[2] Unless otherwise noted, all citations to the record reflect the docket number and page number assigned by the electronic case filing system (CM/ECF) rather than the page numbers of the original documents.

Petitioner's conviction, the Pennsylvania Supreme Court made the following finding of facts, which are accepted as true unless rebutted by clear and convincing evidence, pursuant to 28 U.S.C. § 2254(e)(1). *Commonwealth v. Rush* ("*RUSH I*"), 646 A.2d 557 (Pa. 1994).

In the afternoon of May 8, 1987, Veranica[3] James Hands had planned to meet her husband and friends at a shopping mall. She did not arrive as planned, so her husband went looking for her. He went to their apartment on the upper two floors of a three-story duplex on Federal Street in Philadelphia. He was surprised to find the door to the building and the door to their apartment unlocked. On the stair landing of the third-floor bedroom, he found his wife's body, clad in a bathrobe and partially covered with a blanket and pillows. She was eight-and-a-half months pregnant and had been bound, gagged and stabbed to death. She had more than fifty stab wounds, some puncturing vital organs and fatally penetrating her unborn baby.

The third floor of the apartment had been partially ransacked. Pocket change, paper currency, an imitation Rolex watch, Mrs. Hands' high school ring, gold chain bracelet, other watches, rings and jewelry, and a pair of fingerless sporting gloves were missing from the bedroom. There were no signs of forcible entry into the apartment. A bedroom window was open. Typically, the window was only opened when Mrs. Hands looked out to see who was ringing the doorbell.

Late on the day of the crime, Rush appeared at his acquaintance's, Jerry McEachin, residence. Rush seemed nervous and scared. He showed McEachin a "MAC" card bearing Mrs. Hands' name, a high school ring bearing her initials, other jewelry, coins and paper currency, and a pair of fingerless sporting gloves.

---

[3] Respondents note that at various times throughout the transcript, the victim's first name, Veranica, is misspelled as Veronica, Vernica and other variations. (Respondents' Brief, ECF No. 105 at 12 n.1.)

Rush repeatedly looked out the window, telling McEachin he was looking to see if the police were after him. Rush said he just stabbed his cousin in her apartment on Federal Street, and he had stabbed a woman in the past. McEachin saw blood on Rush's shoelaces. Rush explained that he washed the blood from the knife after the stabbing and put it back in its place in the victim's apartment.

That day, police learned that Rush had been living on the first floor of the building where the victim lived. They went to Rush's mother's home, and when Rush approached and saw the police, he fled. The next day, around 2:00 a.m., McEachin saw Rush hiding under a truck in front of McEachin's home. Rush asked whether any police were in the vicinity. Rush and McEachin then tried to use Mrs. Hands' MAC card, and they visited several jewelers to sell some of her jewelry. Later, Rush threw his shoes in a dumpster and told McEachin he hoped he had not left any bloodstains or footprints at the crime scene.

Police recovered the jewelry Rush sold and identified it as belonging to Mrs. Hands. Rush's fingerprints were found on containers where Mrs. Hands kept her pocket change in her bedroom. Rush's thumbprint was found in blood on a doorjamb by Mrs. Hands' body.

Harold James, a former police officer, was the victim's father and Rush's second cousin. At trial, he testified that after he learned of his daughter's murder, he visited the crime scene. He then went to the police station to speak to a homicide detective. While waiting, he encountered Aaron Pringle, who lived in the first-floor apartment of Mrs. Hands' building. Pringle told James that Rush had also been living on the first floor. James spoke with a detective and told him that Rush should be the prime suspect. James' testimony contained no reference to Pringle saying anything incriminating about Rush.

A police officer testified that when Rush was arrested, he was found hiding behind some clothes in a closet at the home of one of his friends. Rush did not know that the arrest was for a different crime. At trial, to counter the impression that Rush was hiding from the police because he was guilty of killing Mrs. Hands, defense counsel asked the officer what crime he was there to arrest Rush for, and the officer responded that it was for stabbing a lady in a bookstore on Germantown Avenue. Rush had instructed his counsel to elicit this testimony and insisted that he do so. Defense counsel brought this to the attention of the court out of concern for the effect on the jury of evidence of an extraneous crime. The court instructed counsel to proceed on Rush's directive. Rush was convicted and sentenced to death.

On direct appeal, the Pennsylvania Supreme Court held that the evidence was more than sufficient to establish guilt beyond a reasonable doubt for first degree murder, including Petitioner's detailed admissions to McEachin, his possession of the victim's property, and his bloody fingerprint at the crime scene.

The Pennsylvania Supreme Court also held the trial court did not err in admitting testimony of Petitioner's 1979 conviction for robbery, burglary, aggravated assault and attempted rape. The victim of the crime was permitted to describe the attack to establish the identity of the perpetrator of the crimes because the crimes were so similar "that logically the same person has committed both acts." *RUSH I,* 646 A.2d at 560.

> In both cases the intruder gained non-forcible entry, ostensibly by ringing the doorbell. Both victims were neighbors of the appellant and had only recently been introduced to him. Both were attacked while alone in their third floor bedrooms in apartment buildings where appellant resided on the first floor. The victims, both of whom were black, female, and relatively young, had their underclothing or nightclothes pulled from them. Both were then physically restrained and attacked with knives obtained from their own apartments. The assailant repeatedly stabbed both victims until death (or, in the 1979 attack, apparent death) occurred. Mrs. Hands was stabbed more than

> fifty times, and the victim of the previous attack was stabbed eight times. In each case the apartment was ransacked, yet the only valuables taken were small items from the bedroom, i.e., coins, watches, etc. In each case the perpetrator cleaned the borrowed knife and left it at the scene of the crime…. The trial court carefully instructed the jury as to the limited purpose, to wit, identification of the perpetrator, for which evidence of the prior crime could be considered.

*Id.* at 561.

Petitioner also challenged admission of Harold James' testimony that he "told Detective Morton that as a result of my conversation with Pringle that [Rush] should be the prime suspect." *Id.* at 562. The court held Petitioner was not prejudiced by his counsel's failure to object to the testimony.

Petitioner also argued his counsel was ineffective for failing to object to the prosecutor's "very brief remark" during closing argument "that the specific intent to kill necessary to a conviction for murder of the first degree could be inferred from the severity of the victim's wounds, the fact that the victim was bound and gagged, and testimony given by the victim of the stabbing that appellant committed in 1979." *Id.* The court held that defense counsel had in fact objected that the evidence of the 1979 crime could only be considered for identity of the perpetrator, and the trial court gave a curative instruction.

Petitioner also contended that his counsel should have objected to the prosecutor's statement in closing argument "that Harold James, the victim's father, told a police detective that [Rush] should be regarded as the prime suspect because, as soon as he heard that appellant had been residing on the first floor of the victim's building, he recognized that the crime bore appellant's 'signature.'" *Id.* at 563. Petitioner claimed no evidence was introduced that James knew of the similar crime in 1979. Therefore, it was only speculation that James "recognized the present crime as bearing the signature of the same perpetrator." *Id.* The court held the prosecutor's comment

that James recognized Rush's signature was a reasonable inference based on evidence that James had been a Philadelphia police officer for twenty-two years, and he was Rush's second cousin. *Id.*

Petitioner also alleged ineffective assistance of trial counsel for eliciting on cross-examination that when police arrested him, it was for an unrelated stabbing attack. The court rejected this claim because Petitioner had insisted that his counsel elicit this testimony, and the court instructed counsel to follow his client's directive. Although the strategy may have been unwise, it was not unreasonable because it served to dispel the inference that Petitioner was hiding from the police because he was guilty of killing Mrs. Hands.

Petitioner further argued that his counsel was ineffective during jury selection for failing to request that the prosecution provide reasons for its peremptory challenges against black jurors. The court, however, noted that counsel had no right to an explanation for the prosecutor's use of peremptory challenges without first establishing a prima facie case of discrimination, and nothing in the record indicated that counsel could have established a prima facie case. When the issue was raised in post-verdict motions, the trial court specifically recalled that black jurors were selected, although the record did not disclose the racial composition of the jury.

At sentencing, the jury found two aggravating circumstances in support of the death penalty and no mitigating circumstances. The aggravating circumstances were that Petitioner committed murder during a felony, and he had a significant history of felony convictions involving the use or threat of violence to a person. The Pennsylvania Supreme Court found there was sufficient evidence to establish the aggravating factors beyond a reasonable doubt because the present murder was committed in the course of a burglary and robbery, and Petitioner had an extensive record for crimes of violence to a person, including the 1979 offense and a number of additional convictions for robbery, kidnapping, and aggravated assault, which were introduced at the penalty

phase. Finally, the court found "no excess or disproportionality in the sentence imposed" or any basis to find "that the sentence was the 'product of passion prejudice or any other arbitrary factor.'" *Id.* at 565. Thus, Petitioner's conviction and sentence were affirmed on direct appeal.

## II.    PROCEDURAL HISTORY

Richard Brown, Esq., represented Petitioner at trial and in post-verdict motions[4] filed on July 11, 1988. (Respondents' Brief, Ex. O, ECF No. 105-61.) After oral argument, the trial court denied all post-verdict motions on March 30, 1990. (*Id.* at 14.) In a *pro se* communication with the PCRA court on March 28, 1991, Petitioner wrote "stop all decisions on my cases until I can find me a lawyer that will help me to prove to you and the world that 90% of my notes of testimonies has been changed by Hon. James D. McCrudden, Richard L. Brown, Esq., Charles J. Cunningham, III, Esq. and the Stenographer." (Pet., ECF No. 87-1, Appendix at 271-72.)[5] On April 12, 1991, the trial court held a hearing about inaccuracies of the notes of testimony, and the notes were preliminarily found inaccurate as to Petitioner's arraignment. (Respondents' Brief, Ex. P, ECF No. 105-62 at 3.) A reconstruction evidentiary hearing was held on June 27, 1991, and the record was corrected to reflect that Petitioner was arraigned on murder, burglary, robbery and possession of instrument of a crime - weapon. (Respondent's Brief, Ex. R, ECF No. 105-64 at 1.)[6]

---

[4] Brown filed the post-verdict motions on Petitioner's behalf, but he was replaced by Attorney Louis T. Savino, who argued the motions at the hearing on March 30, 1990. (ECF No. 105-61 at 2.)

[5] Petitioner's Appendix I to the petition was filed as a hard copy. Therefore, unlike the CM/ECF citations, citations to Appendix One are to the actual page numbers.

[6] The notes of testimony were incorrect because they did not reflect that Petitioner was arraigned on a charge of burglary. (Pet., App. I at 19.)

The trial court filed its opinion, denying relief on August 29, 1991. (Pet., App. I at 18.) Petitioner filed a notice of appeal and then filed his brief on direct appeal to the Pennsylvania Supreme Court on April 28, 1993. (Respondents' Brief, Exhibits S, T, ECF Nos. 105-65, 105-66.) Petitioner's counsel, Louis T. Savino, was permitted to withdraw, and new counsel, Michael Floyd, was appointed. (Petr's Mem., ECF No. 87-2, Appx. at 287, 289, 295.)[7] Petitioner then wrote to the Supreme Court about his dissatisfaction with Floyd. (*Id.* at 298-99.) He wanted Floyd to present his claim that 90% of his notes of testimony had been changed. (*Id.*) Floyd responded in a letter to the court, copied on Petitioner, that Petitioner's allegation of forged notes of testimony was "absolutely asinine," and he did not allow his clients to dictate trial strategy or raise frivolous issues on appeal. (*Id.* at 301.) On June 18, 1993, Petitioner filed a petition in Pennsylvania Supreme Court to quash Floyd's brief and proceed *pro se*. (*Id.* at 302-10.) The Court forwarded Petitioner's motion to Floyd. (*Id.* at 313-14.) Attorney Michael Floyd represented Petitioner on direct appeal. (Respondents' Brief, Ex. U, ECF No. 105-67.)

As discussed above, on August 23, 1994, the Pennsylvania Supreme Court affirmed the conviction and sentence on direct appeal. *RUSH I*, 646 A.2d 557 (Pa. 1994). Petitioner filed a *pro se* PCRA petition in January 1997.[8] (Respondents' Brief, Ex. V, ECF No. 105-68.) The PCRA court appointed Attorney David Rudenstein to represent Rush. (Petr's Mem., ECF No. 87-6, Appx. at 615-16.) Rudenstein wrote to Petitioner, advising him that the issues Attorney Savino had raised on direct appeal could not be raised again in the PCRA court. (*Id.*) He advised

---

[7] Page number citations to Petitioner's Appendix are to the page numbers of the original document.

[8] Post-Conviction review in Pennsylvania is governed by the Post Conviction Relief Act. 42 Pa. C.S. § 9541 et seq. This Court will refer to any proceedings under the Act as "PCRA" proceedings.

Petitioner they did not have any good "guilt phase" issues.  (*Id.*)  He recommended a psychological examination for Petitioner's penalty phase issues.  (*Id.*)

Apparently not having received Rudenstein's letter, Petitioner wrote to the Administrative Judge of the Court of Common Pleas because he had not heard from the court about appointment of counsel or regarding any of the PCRA petitions that he filed or that the Death Penalty Resource Center filed on his behalf.  (*Id.* at 610-12.)  Petitioner wished to pursue the claim that the notes of testimony had been altered.  (*Id.*)  Petitioner also learned that Rudenstein had been appointed, and he wrote to Rudenstein declining his representation.  (*Id.* at 618-20.)  Petitioner continued to insist that the notes of testimony had been altered, that Jerry McEachin had been bribed by the police to testify, and Petitioner's bloody fingerprint next to the corpse had been falsified.  (*Id.* at 619.)

Petitioner wrote to Rudenstein about the issues he wanted to raise, referring to the *pro se* PCRA motion he had filed, but he did not explain the basis for his belief that the notes of testimony had been altered in such a way that all his appeals up to that time were based on an inaccurate record. (Respondents' Brief, Ex. EE, ECF No. 105-78 at 56-62.)  On September 17, 1997, Rudenstein filed an amended PCRA petition, but he did not raise the issue of altered notes of testimony.  (Petr's Mem., ECF No. 87-6, Appx. at 658-61.)  The court notified Petitioner that it intended to dismiss the PCRA petition without a hearing.  (*Id.* at 633-34.)  Petitioner requested substituting Rudenstein for Billy H. Nolas as his counsel.  (*Id.* at 643.)  On May 11, 1998, the PCRA court dismissed the petition without addressing Petitioner's request to appoint new counsel. (Petr's Mem., ECF No. 87-4, Appx. at 481-82.)

Petitioner, who was still represented by Rudenstein, nevertheless filed a *pro se* appeal of the PCRA court's dismissal, along with a motion to dispense with appointed counsel.  (*Id.* at 487-92.)  The Pennsylvania Supreme Court forwarded these papers to Rudenstein.  (Petr's Mem., ECF

No. 87-5, Appx. at 528-29.) On August 2, 1998, Petitioner inquired about the status of his appeal. (*Id.* at 513.) Petitioner was incorrectly informed that no appeal was pending. (*Id.* at 517.)[9]

Rudenstein filed a brief on PCRA appeal in the Pennsylvania Supreme Court on January 19, 2000. (Respondents' Brief, Ex. BB, ECF No. 105-74.) On December 18, 2003, the Pennsylvania Supreme Court affirmed in part, but reversed and remanded in part to allow Petitioner to amend his petition to further support three claims. *Comm. v. Rush*, ("*RUSH II*") 838 A.2d 651 (Pa. 2003). The three claims remanded were:

> 1) … trial counsel failed to cross-examine the Commonwealth's main witness, Jerry McEachin, regarding his alleged interest in testifying on behalf of the Commonwealth.
>
> 2) … trial counsel was ineffective for failing to request that the jury be polled in order to determine whether the jurors understood that mitigating circumstances need not be determined unanimously; and
>
> 3) … the PCRA Court should have held a hearing to determine what mental health mitigation evidence was available to counsel at the time of the penalty hearing, which resulted in a sentence of death.

(Pet., ECF No. 1-1, Appx. I at 45.)) The Pennsylvania Supreme Court had cautioned Petitioner that the remand was to correct the PCRA court's procedural error in its notice of intent to dismiss, and "the remand should not be construed as *carte blanche* to raise new claims." *Rush*, 838 A.2d at 661.

---

[9] Petitioner filed a *pro se* federal petition for writ of habeas corpus in the Eastern District of Pennsylvania on November 4, 1998. (Respondents' Brief, Exhibits W, X, ECF Nos. 105-69, 105-70.) Petitioner noted that he was unable to obtain representation from the Center for Legal Education, Advocacy and Defense Assistance [Petitioner's present counsel] because two of its members disliked him. (*Id.*, Ex. X, ECF No. 105-70 at 71.) Respondent opposed the petition because Petitioner had not exhausted his state remedies. (Petr's Mem, ECF No. 87-5, Appx. at 523.) Petitioner asked that failure to exhaust be excused, but the District Court, on March 4, 1999, dismissed the petition for failure to exhaust. (Respondents' Brief, Ex. AA, ECF No. 105-73.)

After the Pennsylvania Supreme Court issued its decision, Petitioner sought to represent himself on remand. (Respondents' Brief, Ex. CC, ECF No. 105-75 at 2.) The PCRA court[10] held a hearing on November 23, 2004. (Respondent's Brief, Ex. DD, ECF No. 105-76 at 2.) Petitioner told the Court he did not wish to pursue the three issues that had been remanded; instead, he wanted to file a *pro se* amended petition. (*Id.* at 4-5.) Attorney John Cotter was appointed to represent Petitioner on PCRA remand but then sought to withdraw based on Petitioner's desire to represent himself. (*Id.* at 5.) The Commonwealth noted that the Pennsylvania Supreme Court's order limited the remand to three issues, and it assumed no other issues would be considered. (*Id.* at 16.) The PCRA court relieved counsel and granted Petitioner's request to represent himself and file an amended *pro se* petition, recognizing that the Pennsylvania Supreme Court might decide it was inappropriate. (*Id.* at 13-15.)

On the same day, Petitioner underwent a mental health evaluation to determine his competency. (Pet., ECF No. 1-1, Appx. I at 49.) On November 23, 2004, Dr. James G. Jones, apparently misunderstanding the procedural posture of the case, performed the evaluation and found Petitioner was incompetent to "represent himself during the sentencing phase of his trial." (*Id.*)

On April 21, 2005, the PCRA court reappointed David Rudenstein, Esq. as Petitioner's counsel, and ordered Dr. Jones to reevaluate Petitioner. (Respondents' Brief, Ex. FF, ECF No. 105-79 at 1.) The court order directed that after Dr. Jones' reevaluation, the case would be listed for Dr. Jones to testify and explain his findings. (*Id.*)

Dr. Jones reevaluated Petitioner on June 30, 2005. (Pet., ECF No. 1-1, Appendix I at 52.) In doing so, he reviewed Petitioner's petition, the prior mental health clinic records pertaining to

---

[10] The Honorable John J. Poserina, Jr. presided.

the case, and the notes of the November 23, 2004 colloquy and proceeding. (*Id.*) He concluded

Petitioner was competent to represent himself on PCRA remand. (*Id.* at 53.) Dr. Jones stated:

> During my first evaluation conducted on November 23, 2004, I had
> not had access to the testimony or the colloquy of defendant Larry
> Rush and his request to represent himself. I also did not have the
> opportunity to review the petition that he had prepared [Ex. EE.]
> Without that information, his statements to me seemed somewhat
> delusional. However they have been born in fact. Given that, I wish
> to withdraw the mental health diagnosis that I had given him which
> was Bi-Polar Affective Disorder. At the present time, he has no
> mental health disorder.

(*Id.*)

The next court hearing was on September 13, 2005, and the court acknowledged Dr. Jones'

findings and permitted Petitioner's counsel to withdraw. (Respondents' Brief, Ex. FF, ECF No.

105-79 at 2.) The court continued the case for Petitioner to file a supplemental amended petition.

(*Id.*) In June 2006, the PCRA court relisted the case and, apparently in error, assigned Mr.

Rudenstein to review the case for appeal purposes. (*Id.* at 3.)

The PCRA court held a hearing on April 30, 2007. (Pet., ECF No. 1-1, Appx. I at 55.)

Counsel for the Commonwealth, Robin Godfrey, expressed his opinion that it was error to permit

Petitioner to amend his petition to add new claims because the remand opinion permitted

amendment of only the three remanded claims. (*Id.* at 56.) Petitioner had filed an 86-page *pro se*

petition raising seventeen new claims with subparts. (*Id.* at 56-57.) The prosecutor argued that

this could not be done because the Pennsylvania Supreme Court retained jurisdiction over the

remand. (*Id.* at 57.) He stated that Petitioner had supplemented two of the three remanded claims

in his most recent petition, and the issue was whether Petitioner was ready to go forward with the

proceeding *pro se*. (*Id.*)

Petitioner expressed his continued desire to represent himself. (*Id.*) He reiterated that he did not wish to proceed on the three issues remanded by the Pennsylvania Supreme Court, stating "I'm not a part of no crazy man defense." (*Id.* at 57.) He wanted to file a motion in the Supreme Court asking them to relinquish jurisdiction, so he could bring his own claims. (*Id.*) He did not want to go forward with any of the claims that were brought on his behalf in the first PCRA proceeding. (*Id.*)

Attorney Rudenstein was present and he argued that Petitioner did not meet the *Grazier*[11] standards because he was not willing to comply with the process. (*Id.* at 59.) Petitioner interrupted, "That I knowingly, willingly and intelligently giv[e] up my right to any counsel." (*Id.*) The Court stated, "I can make a ruling now that you have so declared and I will accept that." (*Id.*) Rudenstein again interjected that he did not believe Petitioner understood the procedure or what he was giving up. (*Id.*)

Rudenstein explained that Petitioner was focusing on "a crazy man defense," but the mitigation claim was that trial counsel failed to produce school records, work records and mental health records in terms of mitigation, which was, in Rudenstein's opinion, the most important issue

---

[11] In *Commonwealth v. Grazier*, the Pennsylvania Supreme Court held that "when a waiver of the right to counsel is sought at the post-conviction and appellate stages, an on-the-record determination should be made that the waiver is a knowing, intelligent and voluntary one." 713 A.2d 81, 82 (Pa. 1998). Two years later, in *Martinez v. Court of Appeal of California, Fourth App. Dist.*, 528 U.S. 152, 163 (2000), the U.S. Supreme Court held there is no constitutional right to self-representation on direct appeal from a criminal conviction, but States are not precluded from recognizing such a right under their own constitutions. In *Com. v. Jette*, the Pennsylvania Supreme Court noted that "[t]he implication of *Martinez*, as exemplified by *Staton* [where the court denied counsel's request to withdraw so that the appellant could proceed *pro se* because the procedure would completely disrupt an already delayed appellate process, *Com. v. Staton*, 12 A.3d 277, 283 (Pa. 2010) ] is that, at a minimum, the Court need not be so concerned with the PCRA appellant's personal preferences concerning self-representation as had formerly been assumed."

in the case. (*Id.*) Mr. Godfrey argued that giving up the mitigation claim did not make Petitioner *per se* mentally incompetent. (*Id.* at 60.)

The Court stated that Petitioner filed an 86-page document, showing that "he knew what he was thinking about," and that "he's sitting here today telling this Court that he doesn't want lawyers, that he wants to represent himself." (*Id.*) The court ruled that "under *Grazier*, he has been offered the opportunity and refused it . . . [a]nd with that we'll send it back to the Supreme Court." (*Id.*) In May 2007, the PCRA court issued an opinion stating Petitioner was competent and that he knowingly, voluntarily and willingly decided not to proceed on the remanded issues. (*Id.* at 44-46.)

On July 23, 2007, Petitioner filed an Application for Extraordinary Relief in the Pennsylvania Supreme Court, seeking to start his PCRA proceedings anew, which was denied without comment on October 12, 2007. (Pet., ECF No. 1-1, Appx. I at 78); *Com. v. Rush*, ("*RUSH III*") 934 A.2d 1151 (Pa. 2007) (per curiam). On August 16, 2007, the Commonwealth filed a motion for appointment of counsel and for remand in the Pennsylvania Supreme Court. (Pet., ECF No. 1-1, Appx. I at 62-65.) The Commonwealth noted the PCRA court did not convene an evidentiary hearing on competency, and "the record indicates that, at some point, defendant may arguably have not been competent to waive his right to counsel." (*Id.* at 63.)

On February 11, 2008, the Pennsylvania Supreme Court acknowledged that Petitioner was permitted to proceed *pro se*, and it inquired whether he would file a brief to supplement Attorney Rudenstein's brief filed on his behalf in 2000. (Respondents' Brief, Ex. HH, ECF No. 105-81 at 1-2.) Petitioner responded that he would instead file a motion to quash Rudenstein's "frivolous brief." (*Id.*) He filed the motion to quash on March 19, 2008. (Pet., ECF No. 1-1, Appx. I at 80.)

On April 11, 2008, the Commonwealth filed an answer to Petitioner's motion to quash and brought its renewed motion for remand "for on-record competency proceedings and appointment of counsel (for Rush)." (*Id.* at 84.) The Commonwealth again noted that the PCRA court had not convened an evidentiary hearing with respect to competency. (*Id.* at 85.) The Commonwealth asserted that Petitioner's refusal to file a supplemental brief to his PCRA counsel's original brief made no sense and raised the issue of Petitioner's competency. (*Id.* at 86.) The Commonwealth predicted that failure to hold an evidentiary hearing "could prove prejudicial to both the Commonwealth and defendant on federal review." (*Id.*)

The Commonwealth relied on *Fahy v. Horn*, 516 F.3d 169 (3d Cir. 2008), where a habeas petitioner's waiver of further review was found invalid due to an inadequate record. (*Id.* at 87.) The Commonwealth further noted that the U.S. Supreme Court had granted certification on the question of whether a state may deny self-representation to a defendant who was competent to stand trial but so mentally incapacitated as to be incapable of coherent communication. (*Id.* (citing *Indiana v. Edwards*, No. 07-208.))[12]

---

[12] On June 19, 2008, the Supreme Court held that:

> the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves.

*Indiana v. Edwards*, 554 U.S. 164, 177–78 (2008).

Petitioner opposed a remand. (Pet., ECF No. 1-1, Appx. I at 74-82.) He reiterated his knowing, intelligent and voluntary waiver of the issues raised on PCRA by Attorney Rudenstein. (*Id.* at 81.) He further stated:

> Finally, since such (possibly) court-order psychiatric-examination doesn't call into question the physical-patient relationship, but rather will be a judicial proceeding open to the public, appellant request that such (possibly) court-order psychiatric-examination be transcribe[d] by a court stenographer, as well as officially video-taped, to assure that such proceeding will not be manipulated by the Commonwealth in [o]rder to achieve it[s] objective.

(*Id.* at 82.)

On June 26, 2008, without further discussion, the Pennsylvania Supreme Court granted Petitioner's motion to quash the appeal filed by Rudenstein and denied the Commonwealth's motion for a remand. (*Id.* at 89.)

On October 9, 2008, Michael Wiseman, Esq. of the Capital Habeas Unit filed the present habeas petition as "Next Friend to Larry Rush, petitioner," without Petitioner's consent. (Pet., ECF No. 1.) On October 31, 2008, Petitioner filed a *pro se* petition, seeking to terminate the habeas petition filed by Wiseman without his consent, and seeking to represent himself. (*Pro Se* Pet., ECF No. 4.) Soon thereafter, on November 12, 2008, Governor Edward G. Rendell issued a warrant of execution. (Notice of Execution, ECF No. 5-1.) Petitioner and his "next friend" filed motions to stay the warrant of execution, and a stay was granted. (Unopposed Mot. to Stay Execution, ECF No. 5, ¶3; Order, ECF No. 10.)

On January 29, 2009, the Honorable Anita Brody held a status conference in this habeas matter and appointed Dr. Robert Mark Wettstein to evaluate Petitioner for competency to represent himself. (Order, ECF No. 23.) Petitioner objected, but Judge Brody denied his motion to rescind the order appointing Dr. Wettstein to evaluate him. (Explanation and Order, ECF No. 29.)

Petitioner appealed the order and moved for a stay of the psychiatric evaluation pending appeal. (Notice of Appeal, ECF No. 30; Mot. for Stay Pending Appeal, ECF No. 32.) On June 4, 2009, the Third Circuit dismissed the appeal for lack of jurisdiction. (Order of USCA, ECF No. 35; *Rush v. Beard*, C.A. No. 09-9001 (3d Cir.))

Petitioner then refused Dr. Wettstein's attempt to evaluate him. (Wettstein Letter, ECF No. 40.) Judge Brody ordered that Petitioner accept counsel for his habeas petition because he refused to be evaluated for competency. (Explanation/Opinion, ECF No. 36)[13] On June 8, 2009, Judge Brody ordered that Michael Wiseman, Esq. was appointed to represent Petitioner *nunc pro tunc* as of October 9, 2008, and directed the Clerk to remove the "Next Friend" designation from the petition. (Orders, ECF Nos. 37-39.)[14] Petitioner, acting *pro se*, and Respondents sought reconsideration. (Petr's Mot. in Opp., ECF No. 42; Commonwealth's Mot. to Reconsider, ECF No. 45.) Judge Brody denied both motions. (Order, ECF No. 44; Order, ECF No. 49.)

On September 28, 2009, Petitioner sued his Federal Defender attorneys and Judge Brody, under 42 U.S.C. § 1983, for denial of his right to represent himself. *Rush v. Wiseman et al*, 09-cv-4385-JR (E.D. Pa.) (Compl., ECF No. 1.) The case was dismissed without prejudice on August 5, 2010. (*Id.*, Orders, ECF Nos. 13, 15, 17.) On May 4, 2011, the Third Circuit Court of Appeals designated the undersigned to handle Petitioner's habeas petition. (Designation of District Judge for Service in Another District Within the Circuit, ECF No. 91.)

Petitioner presents the following grounds for relief in his habeas petition:

---

[13] Petitioner appealed this order (Notice of Appeal, ECF No. 47), and the Third Circuit dismissed the appeal for lack of jurisdiction. *Rush v. Beard*, C.A. No. 09-3138 (3d Cir.) (Order of USCA, ECF No. 53.)

[14] Wiseman withdrew after leaving the employ of the Federal Community Defender, with his co-counsel continuing to serve as Petitioner's counsel. (Notice, ECF No. 99.)

I.  COUNSEL WAS INEFFECTIVE IN FAILING TO PROPERLY INVESTIGATE, AND PRESENT EVIDENCE ESTABLISHING THAT THE COMMONWEALTH'S PRIME WITNESS JERRY MCEACHIN HAD A MOTIVE TO FABRICATE HIS TESTIMONY.

II. [a] TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO REQUEST THAT THE MOTION IN LIMINE REGARDING THE ADMISSIBILITY OF PRIOR CRIME EVIDENCE BE HEARD BEFORE A DIFFERENT JUDGE. [b] THE TRIAL COURT ERRED WHEN IT ADMITTED A PRIOR BAD ACT TO PROVE THE IDENTITY OF THE PERPETRATOR OF THE CRIME.

III.  PETITIONER WAS SENTENCED BY A JURY "UNCOMMONLY WILLING TO CONDEMN A MAN TO DIE."

IV.  [a] PETITIONER'S TRIAL PROSECUTOR EXERCISED PEREMPTORY CHALLENGES IN A RACE AND [b] GENDER-DISCRIMINATORY MANNER IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.  [c] ALL PRIOR COUNSEL WERE INEFFECTIVE IN FAILING TO PROPERLY RAISE, AND LITIGATE THIS ISSUE.

V.  COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO CERTAIN PORTIONS OF THE TESTIMONY OF HAROLD JAMES.

VI.  TRIAL COUNSEL UNREASONABLY FAILED TO DISCLOSE THE FACT THAT HE HAD BEEN A SPECIAL PROSECUTOR, THEREBY DENYING PETITIONER THE OPPORTUNITY TO ASSESS WHETHER HIS COUNSEL WAS LABORING UNDER A CONFLICT OF INTEREST.

VII.  COUNSEL WAS INEFFECTIVE FOR FAILING TO GIVE NOTICE OF AND PRESENT TESTIMONY REGARDING PETITIONER'S ALIBI.

VIII.  TRIAL COUNSEL FAILED TO REASONABLY INVESTIGATE THE FORENSIC EVIDENCE PRESENTED AGAINST PETITIONER, INCLUDING FINGERPRINT ANALYSIS AND BLOOD ANALYSIS; THIS EVIDENCE WAS THE ONLY DIRECT EVIDENCE OF THE IDENTITY OF THE PERPETRATOR.

IX.  COUNSEL WAS INEFFECTIVE IN FAILING TO INVESTIGATE, DEVELOP, AND PRESENT AVAILABLE BACKGROUND AND MITIGATION EVIDENCE RELEVANT TO THE PENALTY PHASE IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

X.  [a] THE PENALTY-PHASE INSTRUCTIONS VIOLATED THE EIGHTH AMENDMENT AND [b] ALL PRIOR COUNSEL INEFFECTIVELY FAILED TO LITIGATE THIS ERROR.

XI. TRIAL COUNSEL WAS INEFFECTIVE WHEN HE FAILED TO POLL THE INDIVIDUAL JURORS BEFORE THE DEATH SENTENCE WAS RECORDED.

XII. COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE PROSECUTOR'S INSINUATION THAT PETITIONER WOULD BE ELIGIBLE FOR PAROLE IF HE RECEIVED A LIFE SENTENCE.

XIII. PETITIONER'S DEATH SENTENCE WAS OBTAINED IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT WAS BASED ON A[N] INVALID AGGRAVATING CIRCUMSTANCE.

XIV. THE PROSECUTOR COMMITTED MISCONDUCT WHEN HE URGED THE JURY TO SEND A MESSAGE TO THE COMMUNITY BY IMPOSING A DEATH SENTENCE IN THIS CASE.

XV. THE REASONABLE DOUBT INSTRUCTION WAS UNCONSTITUTIONAL.

XVI. THE PROSECUTOR COMMITTED MISCONDUCT BY INVADING THE PROVINCE OF THE JURY WHEN HE ARGUED THE JURY SHOULD DISREGARD MITIGATING EVIDENCE [AT] TRIAL IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

(Pet., ECF No. 1-1.)

Petitioner submitted Grounds XVII through XXII, with the following explanation:

Throughout the many years of state court litigation Petitioner has raised a number of claims that are either facially deluded, or for which there is no apparent record or extra-record support. Counsel sets forth the following claim headings because, given Petitioner's inability to cooperate with counsel, along with counsel's lack of knowledge about the facts that may underlie these claims, counsel is reluctant to waive any claim – even those that appear on their face to be the product of a disturbed mind.

XVII. ALL PRIOR COUNSEL CONSPIRED WITH COMMONWEALTH TO ALTER TRANSCRIPTS TO PREVENT PETITIONER FROM RAISING CONSTITUTIONAL CLAIMS OF MERIT; THIS WAS INEFFECTIVE. APPELLATE COULD NOT ADEQUATELY BRIEF THE ISSUES WITHOUT THE ONE TRUE COPY.

XVII. TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT AVAILABLE EVIDENCE FROM THE ALLEGED JEWELER WHO BOUGHT

PROCEEDS FROM THE CRIME TO CONTRADICT TESTIMONY FOR A KEY WITNESS FOR THE PROSECUTION, JERRY MCEACHIN.

XIX. COUNSEL FAILED TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE THAT DETECTIVE JAMES MORTON FALSIFIED EVIDENCE AGAINST PETITIONER THROUGH A KEY WITNESS FOR THE PROSECUTION, JERRY MCEACHIN.

XX. APPELLATE COUNSEL HAD DIRECT CONFLICT OF INTEREST WITH PETITIONER WHEN HE RESPONDED TO PETITIONER'S ALLEGATIONS OF THE TRANSCRIPT ALTERATION BY CALLING THE ALLEGATION "ABSOLUTELY ASININE."

XXI. PCRA COUNSEL INEFFECTIVE BECAUSE HE BRIEFED (UNKNOWN TO PETITIONER) ISSUES WITHOUT BENEFIT OF THE TRUE TRIAL TRANSCRIPT.

XXII. PETITIONER WAS DENIED EQUAL PROTECTION RIGHTS BECAUSE HE WAS NOT PERMITTED TO REPRESENT HIMSELF IN THE WAY THAT OTHER PRISONERS ARE PERMITTED TO REPRESENT THEMSELVES. THE PROTHONOTARY INTRUDED IN THE CASE AND WOULD NOT ACCEPT FILINGS OR WOULD FORWARD THE FILINGS TO COUNSEL THAT PETITIONER DID NOT ACKNOWLEDGE, BOTH ON DIRECT APPEAL AND PCRA.

(Pet., ECF No. 1-1 at 60-61.) In his reply brief, Petitioner explained that these *pro se* claims were offered to support his incompetence to proceed *pro se*, not as claims to be decided on the merits. (Petr's Reply Brief, ECF No. 116 at 41.)

Petitioner also raised a claim in his Memorandum in Support of the Petition. This unnumbered claim states: Counsel Was Ineffective for Failing to Object to the Prosecutor's Closing Statement that the Crime Bore Petitioner's Signature. (Petr's Mem., ECF No. 86 at 47 n. 19.) This claim was exhausted on direct appeal. (*Id.*)

The parties agree that Grounds Five and Twelve were exhausted in the state courts and are properly before this Court. First, the Court will begin with analysis of the exhausted claims. Second, the Court will address those claims that were never raised in the state courts, Grounds 2a, 2b, 3, 8, 13, 14, 15, 16 and Pro Se Claims XVII to XXII. Third, the Court will consider the claims

that were not raised through one complete round of the state's appellate review process. Fourth, the Court will address the claims that were presented differently in the habeas petition from what was presented in the state courts. Finally, the Court will analyze the three claims that Petitioner waived on PCRA remand.

III.    DISCUSSION

A.    Habeas Standard of Review

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court recently explained this standard:

> "'[C]learly established Federal law'" for purposes of § 2254(d)(1) includes only "'the holdings, as opposed to the dicta, of this Court's decisions.'" *Howes v. Fields*, 565 U.S. ——, ——, 132 S.Ct. 1181, 1187, 182 L.Ed.2d 17 (2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). And an "unreasonable application of" those holdings must be "'objectively unreasonable,'" not merely wrong; even "clear error" will not suffice. *Lockyer v. Andrade*, 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). Rather, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. ——, ——, 131 S.Ct. 770, 786–787, 178 L.Ed.2d 624 (2011).

*White v. Woodall*, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698 (2014).

When the habeas claim is for ineffective assistance of counsel,

> AEDPA review is "doubly deferential," *Cullen v. Pinholster*, 563 U.S. 170, 190, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), because counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Burt v. Titlow*, 571 U.S. ——, ——, 134 S.Ct. 10, 17, 187 L.Ed.2d 348 (2013) (quoting *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); internal quotation marks omitted). In such circumstances, federal courts are to afford "both the state court and the defense attorney the benefit of the doubt." *Burt*, *supra*, at ——, 134 S.Ct., at 13.

*Woods v. Etherton*, 136 S.Ct. 1149, 1151 (2016) (per curiam).

In presenting a *Strickland* claim in the first instance, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (citing *Bell v. Cone*, 535 U.S. 685, 702

(2002); *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986); *Strickland*, 466 U.S. at 689; *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

The second prong of the *Strickland* test, prejudice, requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is one 'sufficient to undermine confidence in the outcome.'" *Collins v. Sec. of Pennsylvania Dept. of Corr.*, 742 F.3d 528, 547 (3d Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). The "ultimate focus" of the prejudice inquiry is on the fundamental fairness of the proceeding. *Strickland*, 466 U.S. at 696. "Prejudice is viewed in light of the totality of the evidence at trial and the testimony at the collateral review hearing." *Collins*, 742 F.3d at 547 (citing *Rolan v. Vaugh*, 445 F.3d 671, 682 (3d. Cir. 2006)). A court need not address both components of the ineffective assistance inquiry. *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*

B.  Exhausted Claims

1.  Ground Five:  Counsel Was Ineffective for Failing to Object to Certain Portions of the Testimony of Harold James.

In Ground Five, Petitioner contends his trial counsel failed to object to prejudicial hearsay testimony of Harold James, the victim's father. (Pet., ECF No. 1-1, ¶¶57-58; Petr's Mem., ECF No. 86 at 44-47.) James was a former Philadelphia police officer. (Pet., ¶57.) He testified that on the night of his daughter's murder, he went to the police station to speak to Detective Morton, the lead investigator on the case. (*Id.*) While waiting to speak to Morton, James talked to Aaron Pringle, who lived on the first floor of his daughter's building. (*Id.*) When James spoke to Morton, he urged him to investigate Petitioner as the prime suspect in the murder, which Petitioner contends

was based solely on James' conversation with Pringle.  (*Id.*)  James gave the following testimony at trial:

> Q.  And while you were waiting to speak to Detective Morton did you encounter one Aaron Pringle at that location.
>
> A.  Yes.
>
> Q.  Did you know Mr. Pringle?
>
> A.  No, I didn't.
>
> Q.  Did you have a conversation with him?
>
> A.  Yes.
>
> Q.  And after your conversation with Mr. Pringle did you talk to Detective Morton?
>
> A.  Yes.
>
> Q.  And what, if anything, did you tell him?
>
> A.  I told Detective Morton that as a result of my conversation with Pringle that [Rush] should be the prime suspect.

(*Id.*, quoting NT 6/24/88 at 5-6.)

Petitioner asserts this testimony conveyed to the jury that Pringle implicated Petitioner as the guilty party, and Pringle's opinion of guilt was compelling evidence because he lived in the victim's building, and he knew Petitioner and the victim.  (*Id.*, ¶58.)  According to Petitioner, jurors were led to believe it was reasonable police strategy to rely on Pringle's opinion in focusing exclusively on Petitioner as the suspect long before they had any evidence connecting him to the crime.  (*Id.*)  Petitioner contends the state court's adjudication of this claim was based on an unreasonable determination of the facts considering the record before it.  (Petr's Mem., ECF No. 86 at 45-46.)

The state court held that defense counsel's cross-examination of James:

> plainly established that James was giving his own opinion that [Rush] was the suspect, rather than relaying an opinion held by Pringle. It also established that he formed his opinion based on the simple fact that [Rush] "had been on the first floor" of the victim's building. The fact that [Rush] resided on the first floor was undisputed at trial, and was established by other witnesses.

(*Id.* at 46, (quoting *RUSH I*, 646 A.2d at 562.)) The court found that "even if James' testimony could 'have been interpreted as implying that Pringle said something of an incriminating nature, that implication was fully negated during cross-examination'…." (*Id.*)

Petitioner contends this finding is unsupported by the record. (*Id.*) The state court relied on the following exchange in cross-examination:

> Q. Now, the statement you gave to Detective Morton must have occurred after your discussion . . . with Aaron Pringle, correct?
>
> A. Yes.
>
> Q. And did you make your suggestion regarding Mr. Rush as a prime suspect before you gave your statement to Morton?
>
> A. Yes.
>
> Q. In fact, would that have been the first thing you did, tell him who you think is the suspect?
>
> A. Yeah, once I found out that Larry Rush had been on the first floor.

(Petr's Mem., ECF No. 86 at 47; quoting NT 6/24/88 at 9.)

Petitioner asserts this exchange did nothing to negate the impression that Pringle implicated Petitioner in his conversation with James. (*Id.*) Petitioner further argues the state court unreasonably concluded that James' testimony was of minor significance in the case, when in fact the prosecution relied on James' testimony during closing argument to demonstrate a link between the murder of Veranica Hands and a prior crime committed by Petitioner. (*Id.*, quoting NT 6/26/88 at 69.)

In opposition to this claim, Respondents argue that James' testimony was not hearsay; he testified about the conclusion he drew after his conversation with Pringle, without stating what Pringle had said.  (Respondents' Brief, ECF No. 105 at 137.)  Further, Respondents contend that the testimony did not imply that Pringle said Petitioner was the murderer.  (*Id.* at 138.)  James explained what he learned from Pringle was that "Larry Rush had been on the first floor" of the victim's building.  (*Id.*)  The state court noted this fact was uncontested.  (*Id.*)

Although it was addressing another claim [that the prosecutor committed misconduct by arguing the crime bore Rush's signature], the Pennsylvania Supreme Court determined "Harold James had been a Philadelphia police officer for twenty-two years and, most-importantly, was [Rush's] second cousin.  It was reasonable to infer, therefore, that he was aware of the crime Petitioner had committed in Philadelphia in 1979." (*Id.,* (citing Pet., ECF No. 1-1, Appx. I at 6.)) Thus, once James learned from Pringle that Petitioner had been living on the first floor of the victim's building, he tied his prior knowledge of Petitioner's recent release from prison for a very similar crime in 1979, involving the stabbing of Petitioner's upstairs neighbor.  (Respondents' Brief, ECF No. 105 at 138-39.)

In reply, Petitioner notes the Pennsylvania Supreme Court recognized that James' testimony might have been misunderstood as implying an incriminating statement by Pringle. (Petr's Reply Brief, ECF No. 116 at 23-24, (citing *RUSH I*, 646 A.2d at 562.))  Further, the state court did not make a factual finding that James' testimony was based on his years of police experience or his relationship with Petitioner.  (*Id.*)

This Court finds that the Pennsylvania Supreme Court reasonably held there was no prejudice[15] from trial counsel's failure to object to James' testimony. The court stated, "[i]n the face of the compelling evidence of Petitioner's guilt introduced at trial, such as Petitioner's admissions to McEachin, bloody fingerprint at the crime scene, and possession of the victim's property, James' testimony was of minor significance." *RUSH I*, 646 A.2d at 562. McEachin testified that Petitioner told him he had just stabbed his cousin, a woman who lived on Federal Street, and that he committed the stabbing with a knife that he found in the victim's apartment. *Id.* at 559. This testimony was bolstered by evidence that Petitioner's "fingerprints were found on containers that held pocket change in the victim's bedroom" and his thumbprint "was found on a doorjamb beside the victim's body." *Id.* Additionally, personal items belonging to the victim and her husband were missing from the bedroom when the victim's body was recovered, and police recovered the jewelry, which Petitioner had sold. *Id.*

The possibility that the jury might have incorrectly deduced that Pringle said something to James incriminating Petitioner in the crime does not undermine confidence in the outcome of the trial, as required to establish the prejudice prong of a *Strickland* claim. A guilty verdict was likely absent James' testimony about Pringle, based on the physical evidence found at the crime scene,

---

[15] The Pennsylvania Supreme Court did not cite *Strickland* when it concluded "it cannot be said appellant was prejudiced by counsel's failure to object." *RUSH I*, 646 A.2d at 562. The court relied on state law, *Com. v. Clemmons*, 479 A.2d 955, 958 (Pa. 1984), which states that a claim of ineffective assistance of counsel "occurs only where the alternative [action by counsel] offered a potential for success substantially greater than the tactics used" (internal quotations omitted) and the defendant must show "the likelihood that he was prejudiced as a result thereby." *Id.* at 57. The Third Circuit has ruled "that that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to *Strickland*." *Jacobs v. Horn*, 395 F.3d 92, 107 (3d Cir. 2005) (citing *Werts v. Vaughn*, 228 F.3d 178, 204 (3d Cir. 2000)).

the evidence recovered from the jewelers where Petitioner sold the victim's jewelry, and McEachin's testimony. Therefore, Ground Five of the habeas petition is denied.

2.      Ground Twelve: <u>Counsel Was Ineffective For Failing to Object to the Prosecutor's Insinuation that Petitioner Would be Eligible for Parole if he Received a Life Sentence.</u>

Petitioner argues that the prosecutor led the jury to believe that he would be eligible for parole if he were given a life sentence, contrary to the law in Pennsylvania that "life" meant life without parole, and his counsel unreasonably failed to object. (Pet., ECF No. 1, ¶¶94-98; Petr's Mem., ECF No. 86 at 74-78.) The jury heard evidence about Petitioner's recent release on parole from committing a similar crime in 1979, and the prosecutor's statements in closing arguments insinuated that if Petitioner was sentenced to life and was released on parole, he would attack again. (Pet., ECF No. 1, ¶¶95- 96.)

In closing arguments, the prosecutor stated, "[h]e's going to come at you [] and he's going to come at you with a knife. Now let's talk about his parole because parole is also significant." (*Id.*, ¶96, quoting NT 6/29/88 at 61.) According to Petitioner, the prosecutor was insinuating that if the jury did not sentence him to death, he could be released from prison again and commit more crimes, possibly against the jurors. (*Id.*) Petitioner contends reasonable trial counsel would have objected to these statements because otherwise "the jury's sentence was the product of confusion and fear." (*Id.*, ¶97.)

On the issue of trial counsel's ineffectiveness, the PCRA court held:

> [W]hen viewed in context, the prosecutor's statements regarding parole were made in relation to the aggravating circumstance that Appellant had a significant history of convictions for violent crimes. In referring to parole, the prosecutor referred to parole to demonstrate that Appellant's history of violent crimes was "significant" since Appellant was only on parole for a short period of time – "52 days" – before committing additional crimes and that "he broke faith in society when he did that." Thus, when the

29

statements are placed in context, the prosecutor's argument had nothing to do with the fact that Appellant could be paroled if he received a life sentence. Appellant's claim is without merit.

(Petr's Mem., ECF No. 86 at 78, (quoting *RUSH II*, 838 A.2d at 659.)) Petitioner contends that the state court unreasonably concluded the prosecutor's statements did not imply that he could be paroled if he received a life sentence, and the only purpose of the statements was to mislead the jury. (*Id.*)

Respondents counter that the state court reasonably found the prosecutor did not insinuate that Petitioner would be eligible for parole if he received a life sentence. (Respondents' Brief, ECF No. 105 at 195.) In context, the prosecutor was attacking the credibility of Petitioner's family members, who testified of his good character. (*Id.*) The State argued in closing argument:

> Just as these other two women, Annamay Little and Denise Kellar were trying to help him inside of the flower shop, just as Doris Jones tried to help him back in 1979 when he asked to use her phone. And then four days later [after stabbing Ms. Nitterauer,] you heard how he turned on his own cousin at knife point and stabbed her 51 times.
>
> That is a significant history of conviction for violence [a statutory aggravating circumstance] if ever there were one. But it's significant in another respect. It's significant in that he employs deceit before he does these. He worms his way inside peoples' kindliness, their Good Samaritanness and then he turns on them violently with a knife. Turns on everyone but those he cares about.
>
> And if that doesn't tell you he knows exactly what he's doing, then nothing else should. He cares nothing about anyone who stands in his way of what he wants at that time. He's nice to his mother. He's nice to his cousins, but anybody else look out. He's going to come at you and he's going to come at you with a knife.
>
> Now, let's talk about his parole, because parole is also significant. Parole is society saying to an individual you have done your time, you have paid your price. We trust you. We are returning you to society. You can walk among us. You can walk among the peaceful and the law abiding. And he broke faith in society when he did that. It didn't take him but 52 days to break faith. It's also evidence of his deceit.

(Respondent's Brief, ECF No. 105 at 195-96, (quoting Exhibit N, ECF No. 105-59 at 61-62)) (alterations in original). Respondent asserts Petitioner's trial counsel had no reason to object because the prosecutor did not imply that Petitioner would be paroled if the jury gave him a life sentence. (*Id.* at 196.)

The PCRA court found that the statement was properly offered to permit the jury to consider defendant's character and background with respect to the penalty. (*Id.* (citing Pet., ECF No. 1-1, Appx. I at 42.)) Additionally, the PCRA court observed that defense counsel told the jury several times in his closing argument that a life sentence meant life, a sentence Petitioner would not even begin to serve until he was 76-years old. (Respondents' Brief, ECF No. 105 at 197 (citing N.T. 6/29/88 at 44-45, 55.)) On PCRA appeal the Pennsylvania Supreme Court rejected the claim, agreeing that the prosecutor's comment did not imply that a life sentence meant Petitioner could be paroled. (*Id.* (citing Pet., ECF No. 1-1, Appx. I at 15; *RUSH II*, 838 A.2d at 659.))

In reply, Petitioner argues that the state court's adjudication of the ineffective assistance of trial counsel claim was based on an unreasonable determination of the facts under § 2254(d)(2). (Petr's Reply Brief, ECF No. 116 at 35.) He contends the only reason the prosecutor mentioned parole was to highlight the crimes Petitioner committed while on parole, and then the prosecutor stated no one is safe from Petitioner and his knife unless he is sentenced to death. (*Id.*)

Habeas review is of the highest state court's determination of the federal constitutional claim. *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018). "Deciding whether a state court's decision "involved" an unreasonable application of federal law or "was based on" an unreasonable determination of fact required the federal habeas court to "train its attention on the particular reasons−both factual and legal−why the state courts rejected a state prisoner's federal claims." *Id.*

(quoting *Hittson v. Chatman*, 576 U.S. __, __, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J. concurring in denial of certiorari)).

The Pennsylvania Supreme Court noted that a prosecutor "must have 'reasonable latitude in fairly presenting a case to the jury and must be free to present his or her argument with logical force and vigor'" and such comments "must be reviewed in the context in which they were made." *RUSH II*, 838 A.2d at 659.   The court found the ineffective assistance of counsel claim without merit because:

> In this case, when viewed in context, the prosecutor's statements regarding parole were made in relation to the aggravating circumstance that Appellant had a significant history of convictions for violent crimes. In referring to parole, the prosecutor referred to parole to demonstrate that Appellant's history of violent crimes was "significant" since Appellant was only on parole for a short period of time-"52 days"-before committing additional crimes and that "he broke faith in society when he did that." N.T., 6/29/1998, pp. 61-62. Thus, when the statements are placed in context, the prosecutor's argument had nothing to do with the fact that Appellant could be paroled if he received a life sentence.

*Id.*

This finding was based on a reasonable determination of the state court record. Alternatively, this Court finds there was no prejudice from counsel's failure to object because defense counsel told the jury several times in his closing argument that a life sentence meant life ("Larry Rush will never set foot outside a prison;" "[w]hatever you decide he will never walk the streets again.")  (Respondents' Brief, Ex. N, ECF No. 105-59 at 44-45, 55.)  Therefore, Ground Twelve of the habeas petition is denied.

3.    Unnumbered Claim in Rush's Memorandum in Support of the Petition: <u>Counsel Was Ineffective For Failing to Object to the Prosecutor's Closing Statement that the Crime Bore Petitioner's Signature.</u>

Petitioner's memorandum in support of his petition contains the above unnumbered ineffective assistance of counsel claim in a footnote.[16] (Respondents' Brief, ECF No. 105 at 140-41.) Petitioner argued "this claim was unreasonably adjudicated by the state court on direct appeal. (Petr's Mem., ECF No. 86 at 47 n. 19.) Respondents contend this claim cannot be reviewed because by the time Petitioner filed his memorandum in 2010, the federal statute of limitations had expired, and it was too late to amend the petition to add a new claim. (*Id.* at 141.)

"An amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*, 545 U.S. 644, 650 (2005); *accord Peterson v. Brennan*, 196 F. App'x 135, 140 (3d Cir. 2006) (a new claim that does not relate back to the original petition cannot be added after the limitation period has elapsed) (citing *Crews v. Horn*, 360 F.3d 146, 154 n. 5 (3d Cir. 2004)). None of the claims raised in the original habeas petition address the prosecutor's closing argument that the crime bore Rush's signature. (Pet., ECF No. 1-1 at 13-61). Therefore, this claim is dismissed because it was not timely raised in the petition.

The Court alternatively finds that the claim fails on the merits. The Pennsylvania Supreme Court addressed this claim on direct review and held:

> The other remark to which appellant claims counsel should have objected was a statement by the prosecutor that Harold James, the victim's father, told a police detective that appellant should be regarded as the prime suspect because, as soon as he heard that appellant had been residing on the first floor of the victim's building, he recognized that the crime bore appellant's "signature." Appellant claims that there was no testimony that James knew of the similar

---

[16] Within discussion of Ground Five of the habeas petition, Petitioner stated in footnote 19, "[c]ounsel also unreasonably failed to object to the Commonwealth's statement during closing argument that the instant crime bore Petitioner's 'signature.'" (Petr's Mem., ECF No. 86 at 47 n. 19.)

crime committed by appellant in 1979, and, therefore, that it was purely speculative that James could have recognized the present crime as bearing the signature of the same perpetrator.

It is well established that a prosecutor, in his closing argument, can comment on the evidence introduced at trial as well as the legitimate inferences arising therefrom. *Commonwealth v. Lawson*, 519 Pa. 175, 190, 546 A.2d 589, 596 (1988); *Commonwealth v. Anderson*, 490 Pa. 225, 229, 415 A.2d 887, 888 (1980). Harold James had been a Philadelphia police officer for twenty-two years and, most importantly, was appellant's second cousin. It was reasonable to infer, therefore, that he was aware of the crime appellant committed in Philadelphia in 1979. The prosecutor's comment that James recognized the "signature" of appellant was, therefore, a reasonable inference based on the evidence. Defense counsel had no basis to object.

*RUSH I*, 646 A.2d at 563.

Harold James testified that Larry Rush was his second cousin. (Respondent's Brief, Ex. J, ECF No. 105-39 at 6.) He knew that Rush lived with his mother in the Tasker Street Projects. (*Id.*) Testimony was taken from the victim of a stabbing that Rush committed in 1979. *RUSH I*, 646 A.2d at 116. The trial court instructed that this evidence should be considered only on the issue of identity. *Id.* at 117. Thus, when James testified that the crime bore Rush's "signature," the jury could reasonably infer that James was familiar with his cousin's conviction for stabbing a woman, under like circumstances to this crime, in 1979. Counsel was not ineffective for failing to object to a comment in closing argument that was based on a reasonable inference from the evidence introduced at trial. *See United States v. Hernandez*, 412 F. App'x 509, 511 (3d Cir. 2011) (quotations omitted) (in summation a prosecutor has wide latitude to argue the evidence and any reasonable inferences that can be drawn from that evidence.)

The unnumbered claim in the memorandum in support of the petition is dismissed because it was not timely raised in the petition and is alternatively denied on the merits.

B.    Claims that Were Never Raised in the State Courts:  Exhaustion and Procedural
      Default

Before obtaining federal habeas review of a claim, a state prisoner must first exhaust the

remedies available in the state courts.  28 U.S.C. § 2254(b)(1)(A).  To do so, a petitioner must

fairly present his federal claim to each level of the state courts.  *O'Sullivan v. Boerckel*, 526 U.S.

838, 845 (1999).  It is the habeas petitioner's burden to show "fair presentment" of the federal

claim.  *Toulson v. Beyer*, 987 F.2d 984, 987 (1993).  A petitioner has not exhausted his remedies

"if he has a right under the law of the state to raise, by any available procedure, the question

presented."  28 U.S.C. § 2254(c).

A habeas court must dismiss a mixed petition, one that contains exhausted and unexhausted

claims, to permit a petitioner to exhaust all habeas claims in state court.  *Rose v. Lundy*, 455 U.S.

509, 522 (1982).  A habeas petition that contains exhausted and procedurally defaulted claims is

not a mixed petition because exhaustion is not possible where the state court would find the claims

procedurally barred.  *Toulson*, 987 F.2d at 987.  A claim is technically exhausted but procedurally

defaulted if it was not fairly and properly presented to the state courts, and the state's rules preclude

the petitioner from returning to the state courts to exhaust the claim.  *Lines v. Larkins*, 208 F.3d

153, 160 (3d Cir. 2000); *accord Wenger v. Frank*, 266 F.3d 218 (3d Cir. 2001).  Thus, claims that

are not fairly presented to the state high court in accordance with its mandatory pleading rules are

procedurally defaulted.  *Lines*, 208 F.3d at 162.

Federal review is precluded if the "prisoner has defaulted his federal claims in state court

pursuant to an independent and adequate state procedural rule."  *Coleman v. Thompson*, 501 U.S.

722, 749 (1991).  A state procedural rule is "independent" if application of the rule is independent

of federal law.  *Stewart v. Smith*, 536 U.S. 856, 860 (2002).  A state procedural rule is "adequate"

where "petitioner had fair notice of the need to follow the state procedural rule."  *Bronshtein v.*

*Horn*, 404 F.3d 700, 707 (3d Cir. 2005) (citing *Cabrera v. Barbo*, 175 F.3d 307, 313 (3d Cir. 1999)). State rules are not adequate if they are not "firmly established and regularly followed" or if they are "novel and unforeseeable." *Holland v. Horn*, 519 F.3d 107, 112 (3d Cir. 2008) (quoting *Bronshtein*, 404 F.3d at 707.)

Beginning in 1978, the Pennsylvania Supreme Court applied a "relaxed-waiver rule" in capital cases. *Bronshtein*, 404 F.3d at 708 (quoting *Com. v. McKenna*, A.2d 174 (1978)). Thus "a claim of constitutional error in a capital case would not be waived by a failure to preserve it." *Id.* (quoting *Szuchon v. Lehman*, 273 F.3d 299, 326 (3d Cir. 2001)).

In *Commonwealth v. Albrecht*, 720 A.2d 693 (1998), the Pennsylvania Supreme Court abandoned the relaxed-waiver doctrine in PCRA appeals. *Id.* *Albrecht* applies to cases that were pending at the time it was decided. *See Com. v. Bracey*, 795 A.2d 935 (Pa. 2002) (analyzing retroactivity of *Albrecht*). Although Pennsylvania has abandoned its relaxed-waiver rule, it has been applied by the Third Circuit in instances where the rule was in effect at the time of the petitioner's procedural default based on time-bar and waiver under 42 Pa. C.S. §§ 9543, 9544, 9545. *See Laird v. Horn*, 414 F.3d 419, 425 & n.7 (3d Cir. 2005) (PCRA waiver rule subject to relaxed waiver doctrine); *Bronshtein*, 404 F.3d at 709 (PCRA time-bar subject to relaxed waiver rule); *Szuchon*, 273 F.3d at 326-27 (trial waiver subject to relaxed waiver rule); *Jermyn v. Horn*, 266 F.3d 257, 279 (3d Cir. 2001) (successive petition bar subject to relaxed waiver rule.)

If a claim is procedurally defaulted, "the [habeas] court must then determine whether cause and prejudice existed for [the petitioner's] procedural default or whether failure to consider [the petitioner's claims] would 'result in a fundamental miscarriage of justice.'" *Carter v. Vaughn*, 62 F.3d 591, 595 (3d Cir. 1995) (quoting *Coleman*, 501 U.S. at 750)). Whether there is "cause" to excuse a procedural default "must ordinarily turn on whether the prisoner can show that some

objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Once a petitioner establishes cause, he must prove that prejudice resulted. *Id.* Prejudice is shown where the errors at trial "worked to [Petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494 (quoting *U.S. v. Frady*, 456 U.S. 152, 172 (1982), *reh'g denied*, 456 U.S. 1001 (1982)). The second basis to excuse procedural default, "miscarriage of justice," requires a petitioner to show new evidence of actual innocence. *Schlup v. Delo*, 513 U.S. 298, 321 (1995).

A petitioner may, under certain conditions, establish cause to excuse a procedural default based on ineffective assistance of PCR counsel. *Martinez v. Ryan*, 566 U.S. 1, 17 (2012).

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.*

In *Trevino v. Thaler*, the Supreme Court extended *Martinez* to cases where a state permitted ineffective assistance of counsel claims on direct appeal, but the state's procedures made it "'virtually impossible for appellate counsel to adequately present an ineffective assistance of counsel claim'" on direct review. 569 U.S. 413, 423 (2013) (quoting *Robinson v. State*, 16 S.W.3d 808, 810-11 (Court of Crim. Appeals of Tex. 2000.)) The two characteristics of Texas's procedures that rendered it virtually impossible to adequately present an ineffective assistance of counsel claim on direct appeal were: (1) the nature of an ineffective-assistance claim means that the trial record is likely to be insufficient to support the claim; and (2) Texas courts have directed

defendants to raise ineffective assistance of counsel claims on collateral review rather than on direct review.  *Id.* at 423-26.

The Supreme Court, however, declined to extend *Martinez* to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel when a prisoner's state PCR counsel provides ineffective assistance by failing to raise an ineffective assistance of appellate counsel claim.  *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017).  The Court reasoned, in part, that "if an unpreserved trial error was so obvious that appellate counsel was constitutionally required to raise it on appeal, then trial counsel likely provided ineffective assistance by failing to object to it in the first instance."  *Davila*, 137 S. Ct. at 2067-68.  Under such circumstances, "the prisoner likely could invoke *Martinez* or *Coleman* to object to it in the first instance."  *Id.* at 2068.

Grounds Two (a) and (b), 3, 8, 13, 14, 15, 16 and *Pro Se* claims XVII through XXII of the habeas petition were never raised in state court.  Petitioner states "to the extent the claims herein are found not to be exhausted, any further attempt to exhaust could be deemed futile, as it would be foreclosed by 42 Pa. C.S. § 9545(b), as that provision has been interpreted by the Pennsylvania Supreme Court.[17]  (Petr's Mem., ECF No. 86 at 15.)  Respondent contends these claims are procedurally defaulted because the claims were waived by not raising them in the state court at the appropriate time, and it is now too late to do so.  (Respondent's Brief, ECF No. 105 at 83-96 (citing 42 Pa. C.S. §§ 4593, 4594 and 4595.))

---

[17] The PCRA one-year statute of limitations period begins when the judgment becomes final, with three exceptions for special circumstances.  Pa. C.S. § 9545(b)(1).  "A judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review."  *Id.*, § 9545(b)(3).

In reply, Petitioner asserts that any claims allegedly waived under 42 Pa. C.S. §§ 9543, 9544 because trial counsel or appellate counsel failed to present the claims are not procedurally defaulted because Pennsylvania's waiver rule was not firmly established and regularly followed at the time of his trial and direct appeal, based on the Pennsylvania Supreme Court's relaxed waiver rule. (Petr's Reply Brief, ECF No. 116 at 8-11 (citing *Laird*, 414 F.3d 419 (3d Cir. 2005); *Jermyn v. Horn*, 266 F.3d 257, 278-79 (3d Cir. 2001)).

Even if his claims are procedurally defaulted, Petitioner contends his PCRA counsel's ineffectiveness in failing to raise the unexhausted claims serves as cause to excuse procedural default. (*Id.* at 9, citing *Martinez*, 132 S. Ct. 1309)). Petitioner asserts claims of ineffective assistance of counsel were permitted on direct review in Pennsylvania at the time of his trial and direct appeal. (*Id.* at 10, citing *Com. v. Grant*, 813 A.2d 726 (Pa. 2002) (finding that ineffective assistance of counsel claims must be raised for the first time in collateral review proceedings.) Although Petitioner was permitted to raise ineffective assistance of counsel claims on direct review, he argued the rationale of *Martinez* dictates that "where appellate counsel was ineffective for failing to raise a viable claim on direct appeal (e.g., trial counsel's ineffectiveness), and where post-conviction counsel failed to allege substantial ineffectiveness on the part of appellate counsel, such failure may serve as cause and permit this Court to review the claim de novo." (*Id.* at 11.)

To the contrary, Respondents contend *Martinez* is inapplicable because Pennsylvania law permitted him to raise ineffective assistance of counsel claims on direct appeal in 1994. (Respondents' Sur-reply, ECF No. 120 at 3.) Petitioner's direct appeal became final in 1994, and it wasn't until 2002 that Pennsylvania mandated that ineffective assistance of trial counsel be raised in initial collateral review proceedings. (*Id.* (citing *Com. v. Grant*, 813 A.2d 726 (Pa. 2002)). Thus, Respondents contend *Martinez* is inapplicable. (*Id.* at 4.)

Furthermore, Respondents assert Petitioner's argument that *Martinez* applies to ineffective assistance of PCRA counsel for failing to raise appellate counsel's ineffectiveness is an impermissible broadening of the Supreme Court's rule. (*Id.*)

This Court finds that Ground Two (a) and (b), 3, 8, 13, 14, 15, 16 and *Pro Se* claims XVII through XXII are unexhausted because they were never raised in state court. The claims are procedurally defaulted because it is now too late under 42 Pa. C.S. § 9545(b)(1) for Petitioner to return to state court to exhaust these claims. *See Lines*, 208 F.3d at 163 (where only avenue left under state law to raise unexhausted claims is a second petition under the PCRA, the one-year limitations period of 42 Pa C.S. 9545(b)(1) made the unexhausted claims procedurally defaulted). Whether the one-year PCRA limitations period was firmly established and regularly followed as to constitute a state procedural bar from exhausting the federal claims is determined as of the date the default occurred. *Albrecht*, 485 F.3d at 115 (citing *Doctor v. Walters*, 96 F.3d 675, 684 (3d Cir. 1996)). The procedural default occurred in 2008, when Petitioner first raised these unexhausted claims in his federal habeas petition rather than seeking to file a second PCRA petition in state court. Thus, Pennsylvania's relaxed-waiver rule does not save these claims from procedural default because Petitioner never asserted these claims before he raised them in the present petition, filed in 2008. *See Bronshtein*, 404 F.3d at 709 (the PCRA time limits were well established and regularly followed, at the latest, when the Pennsylvania Supreme Court in *Com. v. Banks*, 726 A.2d 374 (1999) held that the time limits were jurisdictional and not subject to judicial relaxation.)

Cause and prejudice, however, may excuse the procedural default. Respondent ignores the Supreme Court decision in *Trevino* when it argues that the *Martinez* rule is inapplicable here because Pennsylvania law permitted ineffective assistance claims on direct appeal. In *Trevino*, the

Court extended the *Martinez* rule to instances where a state permitted ineffective assistance of counsel claims on direct appeal, but the state's procedures made it "'virtually impossible for appellate counsel to adequately present an ineffective assistance of counsel claim'" on direct review. 559 U.S. at 423 (quoting *Robinson*, 16 S.W.3d 808).

In *Grant*, the Pennsylvania Supreme Court held that, "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." 813 A.2d at 738 ("a claim raising trial counsel ineffectiveness will no longer be considered waived because new counsel on direct appeal did not raise a claim related to prior counsel's ineffectiveness.")[18]  In *Com. v. Hubbard*, the Pennsylvania Supreme Court had adopted a rule that claims of ineffective assistance of trial counsel must be raised at the time a defendant is represented by new counsel, often on direct appeal, otherwise the claims were waived. *Grant*, 813 A.2d at 732 (citing *Hubbard*, 372 A.2d 687 (1977)).  This resulted in the necessity of raising a layered claim of ineffectiveness, that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness. *Id.* at 733.

This rule created difficulties because appellate courts normally do not consider matters outside the record and appellate courts do not act as fact-finders. *Id.* at 734.  "[I]n the arena of ineffectiveness claims" appellate courts often must consider matters outside the record and make factual findings. *Id.*  Even if an ineffectiveness claim is apparent on the existing record "oftentimes, demonstrating trial counsel's ineffectiveness will involve facts that are not available on the record." *Id.* at 737.  "Deferring review of trial counsel ineffectiveness claims until the collateral review stage of the proceedings offers a petitioner the best avenue to effect his Sixth

---

[18] The Pennsylvania Supreme Court clarified that the rule announced in *Grant* does not apply to claims of ineffective assistance of counsel where the intermediate appellate court on direct appeal has rendered a disposition on the merits. *Com. v. Grant*, 821 A.2d 1246 (Pa. 2003).

Amendment right to counsel." *Id.* at 738. For similar reasons, the Supreme Court in *Trevino* extended *Martinez* to states that permitted ineffective assistance of counsel claims on direct review but recognized "'the inherent nature of most ineffective assistance' of trial counsel 'claims' means that the trial court record will often fail to 'contai[n] the information necessary to substantiate' the claim." 569 U.S. at 424 (quoting *Ex parte Torres*, 943 S.W.2d 469, 475 (Tx. 1997) (en banc). Pennsylvania's procedures, like those in Texas, made it "'virtually impossible for appellate counsel to adequately present an ineffective assistance of counsel claim'" on direct review.

Therefore, this Court finds that Petitioner may argue, pursuant to *Grant*, *Trevino* and *Martinez*, that PCR counsel's failure to raise an ineffective assistance of trial counsel claim excuses his procedural default.[19] To overcome procedural default, a petitioner must establish that his counsel in the initial-review collateral proceeding [in Pennsylvania PCRA counsel] failed to raise a substantial claim of ineffective assistance of trial counsel. *Martinez*, 566 U.S. 1 at 17 (2012). To overcome default, a prisoner "must demonstrate that the claim has some merit." *Id.* "When faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, i.e., it does not have any merit or that

_____

[19] *But see Cox v. Horn*, 757 F.3d 113, 125 n. 8 (3d Cir. 2014) ("The Commonwealth appellees argue that *Martinez* does not apply to pre-*Grant* Pennsylvania and that, in any event, Cox availed himself of the opportunity to raise ineffective assistance claims before the trial court and the Pennsylvania Supreme Court. We do not decide whether, as a general matter, Pennsylvania's pre-*Grant* legal landscape falls within the ambit of the *Martinez* rule"); *Fears v. Wetzel*, 05-CV-1421, 2015 WL 4603574 at *6 n. 7 (W.D. Pa. July 30, 2015) (distinguishing *Cox* and holding that where different attorneys represented the petitioner at trial and in post-sentence and direct appeal proceedings, and the appellate attorney raised the issue and developed the record on ineffective assistance of trial counsel claims, and those claims were reviewed on the merits by the Pennsylvania Supreme Court, *Martinez* and *Trevino* did not apply); *Ragan v. Horn*, 00-cv-2092, 2016 WL 1241771 at *7 (E.D. Pa. Mar. 29, 2016) (holding that where the problems with raising ineffective assistance of trial counsel claims described in *Grant* are inapplicable to the case at bar, reliance on *Martinez* and *Trevino* to excuse procedural default is misplaced.)

it is wholly without factual support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards." *Id.* at 15-16.

Below, the Court addresses each procedurally defaulted claim that was never raised in the state courts, and if Petitioner has established cause and prejudice to excuse procedural default.[20]

    1.    Ground Two [a]:  <u>Trial counsel was ineffective when he failed to request that the motion in limine regarding the admissibility of prior crime evidence be heard before a different judge.</u>

Petitioner contends his trial counsel knew the prosecution would try to admit prior crime evidence to prove the identity of the perpetrator, and his counsel should have moved to have the motion in limine heard by a different judge because Judge McCrudden had recently presided over another jury trial where Petitioner was the defendant. (Pet., ECF No. 1-1, ¶¶27, 28.) As evidence of Judge McCrudden's lack of neutrality, Petitioner quotes the following statement Judge McCrudden made after he dismissed the jury in this matter:

> I want to thank you for serving. And I know it's a difficult decision to make but it's the right decision. This man is a suspect in another murder case. The police suspect him of murdering a barber I think up in Mt. Airy. They don't have a clue. He is also suspected of being an assailant with a knife to an antique dealer. Also a suspect stabbing an antique dealer and from what I understand, he was afraid to identify him. The police believe he is the one. And it was all within that short period of time he was out. Such a violent person I have ever encountered.

(*Id.*, ¶29, quoting NT 6/29/88 at 78-79.) Petitioner submits that the admission of prior crime evidence constituted a denial of due process because the prior crime was not sufficiently similar to the present crime to merit admission at trial. (*Id.*, ¶32.)

---

[20] Petitioner submits that he is not claiming actual innocence as a gateway to reach the merits of any procedurally defaulted claim. (Petr's Reply, ECF No. 116 at 14.)

43

Respondent opposes relief based on procedural default, and on the merits because the evidence was properly admitted as identity evidence. (Respondent's Brief, ECF No. 105 at 108-09.) Petitioner contends he can establish cause and prejudice to excuse the procedural default because PCRA counsel was ineffective for failing to raise appellate counsel's ineffectiveness for failing to raise trial counsel's ineffectiveness by failing to request that the motion in limine be heard before a different judge. (Petr's Reply, ECF No. 116 at 18.)

This Court must determine whether trial counsel failed to exercise reasonable professional judgment when he failed to seek Judge McCrudden's recusal from the motion in limine hearing regarding prior crime evidence. *See Davila*, 137 S. Ct. at 2067-68 ("if an unpreserved trial error was so obvious that appellate counsel was constitutionally required to raise it on appeal, then trial counsel likely provided ineffective assistance by failing to object to it in the first instance. In that circumstance, the prisoner likely could invoke Martinez or Coleman to obtain review of trial counsel's failure to object.") Recusal is governed by 28 U.S.C. § 455(a), "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." A judge is not biased or prejudiced simply because he or she sat in successive trials involving the same defendant. *Liteky v. U.S.*, 510 U.S. 540, 551 (1994). Therefore, trial counsel's failure to request that Judge McCrudden recuse himself because he sat in previous trials involving Petitioner was not deficient performance.

As to Judge McCrudden's post-verdict comments to the jury in this matter, the Supreme Court has held:

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed

> sometimes (as in a bench trial) necessary to completion of the judge's task.

*Id.* at 550-51.

Petitioner has failed to show that there is a substantial claim of ineffective assistance of trial counsel based on the failure to seek Judge McCrudden's recusal from the motion in limine hearing. Therefore, he has not shown cause to excuse procedural default of this claim because his PCRA counsel failed to raise the claim of trial counsel's ineffectiveness. Ground Two (a) is dismissed. *See Murray*, 477 U.S. at 497 (procedurally defaulted claim must be dismissed for failure to show cause and prejudice for procedural default).

2. Ground Two [b]: <u>The trial court erred when it admitted a prior bad act to prove the identity of the perpetrator of the crime.</u>

Next, Petitioner asserts the trial court erred by permitting evidence of a prior crime to show identity of the perpetrator, and the error "was so beyond the pale as to constitute a denial of due process" because the prior crime and capital crime "were not nearly similar enough to warrant admission." (Pet., ECF No. 1-1, ¶32.)

Respondents oppose Ground Two (b), arguing that the claim is procedurally defaulted and lacks merit. (Respondents' Brief, ECF No. 105 at 109.) Petitioner challenged admission of the evidence as an error under state law. (*Id.* at 113.) The Pennsylvania Supreme Court analyzed the issue under state law and found sufficient similarities in the two crimes to admit the 1979 crime to show identity and common scheme, plan or design. (*Id.* at 114-15, citing *RUSH I*, 646 A.2d at 560-61.)

Petitioner indeed alleged state-law evidentiary error on direct appeal. (Respondent's Brief, Ex. U, ECF No. 105-67 at 22-30.) In deciding the claim, the Pennsylvania Supreme Court relied on state law evidentiary rules. *RUSH I*, 646 A.2d at 560-61. Where admission of evidence was

raised only as an error of state-law in the state courts, a federal due process claim that the evidentiary error fatally infected the trial is unexhausted. *See Keller v. Larkins*, 251 F.3d 408, 413-14 (3d Cir. 2001) ("a petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." (quoting *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999)). Petitioner asserts his trial, appellate, and PCRA counsel were ineffective for failing to raise the trial court's error in admitting the evidence in violation of the Due Process Clause. (Petr's Reply, ECF No. 116 at 18.)

Therefore, the Court must determine whether there is cause and prejudice to excuse the procedural default of this claim. *See Davila*, 137 S. Ct. at 2067-68 ("if an unpreserved trial error was so obvious that appellate counsel was constitutionally required to raise it on appeal, then trial counsel likely provided ineffective assistance by failing to object to it in the first instance. In that circumstance, the prisoner likely could invoke *Martinez* or *Coleman* to obtain review of trial counsel's failure to object."))

Federal law, like Pennsylvania's evidentiary laws, permits admission of a defendant's prior bad acts to prove the identity of the perpetrator of the crime. *See U.S. v. Brown*, 765 F.3d 278, 291 (3d Cir. 2014) (citing Federal Rule of Evidence 404(b)(2)). The Pennsylvania Supreme Court found the following similarities between the two crimes: (1) the intruder gained non-forcible entry to the third-floor bedroom of the victim in an apartment building where Petitioner resided on the first floor; (2) the victims were both relatively young, black females whose clothing were pulled from them; (3) the victims were both physically restrained in their own apartments and stabbed repeatedly with knives obtained from the own apartments; (4) each apartment was ransacked but only small items were stolen from the bedroom; and (5) in both crimes the perpetrator cleaned the "borrowed" knife and left it at the scene. *RUSH I*, 646 A.2d at 560-61. This Court finds that the

similarities in the 1979 crime and the present crime are sufficient to offer the prior crime to prove the identity of the perpetrator, as found by the Pennsylvania Supreme Court. Thus, trial counsel's objection based on Petitioner's due process right to a fair trial would likely have been overruled.

This Court also finds Petitioner cannot establish the prejudice prong of a *Strickland* claim. To establish *Strickland* prejudice, Petitioner must establish that counsel's failure to object to the admission of the prior bad act under the Due Process Clause of the Fourteenth Amendment deprived him "of a trial whose result is reliable." *See Buehl v. Vauhn*, 166 F.3d 163, 172 (3d Cir. 1999) (quoting *Strickland*). Even if the 1979 crime had not been admitted into evidence, Petitioner would likely have been convicted based on his bloody fingerprint at the crime scene, evidence tying him to the jewelry stolen from the crime scene, and McEachin's detailed testimony about Petitioner's activities after the crime. *See id.* ("in analyzing *Strickland*'s prejudice prong, a court must consider the magnitude of the evidence against the defendant.") Ground Two (b) is dismissed because it is procedurally defaulted, as Petitioner has not shown cause and prejudice to excuse the procedural default.

3.  Ground Three: <u>Due to trial court error and ineffective assistance of trial counsel, Petitioner was sentenced by a jury "Uncommonly Willing to Condemn a Man to Die."</u>

Petitioner asserts that the trial court erred by empaneling a jury that excluded prospective jurors because they voiced general objections to the death penalty, but who were otherwise able and willing to follow the court's instruction and impose the death penalty in an appropriate case. (Pet., ECF No. 1-1, ¶33.) In support of this claim, Petitioner notes that a prospective juror testified she had religious, moral or philosophical beliefs that would prevent her from imposing the death penalty. (*Id.*, ¶35.) When the court asked whether she could not impose the death penalty in any case, she responded that she did not think she could, but when asked whether she was satisfied that

she could not, she said no. (*Id.*, ¶35.) Defense counsel did not conduct follow up questioning. (*Id.*, ¶36.)

Similarly, another juror stated he was Catholic and opposed to the death penalty. (*Id.*, ¶37.) Defense counsel did not ask any follow up questions to determine whether he could set aside his belief and impose the death penalty and follow the law if instructed to do so. (*Id.*) Defense counsel failed to conduct a similar inquiry of ten other jurors who were dismissed. (*Id.*, ¶38.)

Respondents contend this claim, as trial court error or trial counsel ineffectiveness, was never raised in the state courts, and is defaulted due to the PCRA jurisdictional time-bar. (Respondents' Brief, ECF No. 105 at 169.) In reply, Petitioner asserts the procedural default should be excused because PCRA counsel should have raised all substantial claims of appellate counsel's ineffectiveness, and appellate counsel unreasonably failed to raise trial counsel's failure to object the jury selection error. (Petr's Reply, ECF No. 116 at 19.)

*Davila* precludes extension of *Martinez* to excuse procedural default based on PCR counsel's failure to raise appellate counsel's failure to raise a claim of trial court error. *Davila*, 137 S. Ct. at 2065. Therefore, this Court addresses only Petitioner's ineffective assistance of trial counsel claim, for which cause and prejudice may excuse procedural default under *Martinez* if PCRA counsel was ineffective by failing to raise trial counsel's ineffectiveness for failing to object to dismissal of prospective jurors who were ambivalent about their ability to impose the death penalty.

For the merits of the underlying claim that counsel should have objected to dismissal of certain prospective jurors without further questioning, Petitioner relies on the Supreme Court's holding in *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968):

> [A] sentence of death cannot be carried out if the jury … was chosen
> by excluding veniremen for cause simply because they voiced

48

general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

The Court later explained in *Lockhart v. McCree*, 476 U.S. 162, 176 (1986), that "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." The state has the burden to prove a potential juror is biased. *Wainwright v. Witt*, 469 U.S. 412, 445 (1985). Exclusion of one venireperson in violation of the *Witherspoon* rule requires that the death penalty be vacated. *Gray v. Mississippi*, 481 U.S. 648, 657-58 (1987). A *Witherspoon* violation is not subject to harmless error analysis. *Id.* at 668. A jury selected in violation of *Witherspoon* violates a defendant's constitutional right to an impartial jury because that jury is "uncommonly willing to condemn a man to die." *Witherspoon*, 391 U.S. at 521.

Prospective Juror B. told the trial court that she does not believe in the death penalty. (Respondent's Brief, ECF No. 105-9, Ex. E, part 1 at 58.) In response to whether she held beliefs that would prevent her from imposing the death penalty, she responded, "I think I do." (*Id.* at 59.) When asked how deeply-rooted her convictions were, she responded that she was a vegetarian. (*Id.*) When asked whether she could impose the death penalty in any case, she said "I don't think I could." (*Id.*) When pressed whether she was satisfied that she could not [impose the death penalty], she said "No." (*Id.*)

Prospective Juror H. stated that he has deeply-rooted beliefs that would prevent him from imposing the death penalty in all cases. (*Id.* at 102-03.) Prospective Juror T. testified that she would not be able to return a death verdict in any case due to her beliefs. (*Id.* at 92-93.) Prospective Juror R. was equivocal at first. (Respondents' Brief, ECF No. 105-10, Ex. E, part 2 at 19-21.)

Upon further questioning, he stated, "This is the first time I was ever in this predicament and I don't think I could. I couldn't sentence anybody." The judge asked, "in all cases?" R. answered, "in all cases." (*Id.* at 20.)

Prospective Jurors M., W., F. and L. testified that they could not impose the death penalty in any case. (Respondent's Brief, Ex. E, part 2, ECF No. 105-10 at 37-39, 68-71, 82-86; Ex. F, part 1, ECF No. 105-11 at 21-26.) Prospective Juror J.H. answered that if he was on a jury, he could not possibly vote for the death penalty. (*Id.* at 76-80.) Prospective Juror C.B. did not think he could impose the death penalty based on his religion. (*Id.* at 72-75.) When asked, "[i]n other words you don't think you could impose the death penalty in any kind of case; is that right?" (*Id.* at 74.) He responded, "[n]o, no. I don't think death penalty, no, I don't think so." (*Id.* at 74-75.)

Prospective Juror S. stated it would bother her to impose the death penalty based on her religion. (Ex. F, part 2, ECF No. 105-12 at 29-32.) When asked if she could impose the death penalty regardless of the type of case, she said, "I think it would bother me. You want an honest opinion and that's the way I feel." (*Id.* at 32.)

Prospective Juror D.B. had difficulty at first answering whether she could return a death verdict in an appropriate case. (Respondents' Brief, Ex. G, ECF No. 105-13 at 75-78.) After directing her to give it some thought, and telling her if she could not do so, "say you can't," she responded, "I don't think I could." (*Id.* at 78.) Prospective Juror S.F. was not specifically asked about the death penalty, but she was equivocal about whether she could, in general, follow the law as given by the judge because she objected to some laws. (*Id.* at 79-81.) Each of these prospective jurors was dismissed.

The *Witherspoon* Court explained that the issue before it was narrow:

> It does not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about

> capital punishment would prevent them from making an impartial decision as to the defendant's guilt. Nor does it involve the State's assertion of a right to exclude from the jury in a capital case those who say that they could never vote to impose the death penalty or that they would refuse even to consider its imposition in the case before them. For the State of Illinois did not stop there, but authorized the prosecution to exclude as well all who said that they were opposed to capital punishment and all who indicated that they had conscientious scruples against inflicting it.

391 U.S. at 513-14 (footnote omitted). Thus, the Court held, "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522.

The Supreme Court reexamined *Witherspoon* in *Wainwright v. Witt*, 469 U.S. 412 (1985).

The Supreme Court clarified *Witherspoon* by holding:

> the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment … is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with *Witherspoon's* reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully *infra*, this is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 425–26 (footnotes omitted). The trial judge's ruling on a juror challenge based on bias is a factual issue that is entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Id.* at 428-29. The finding of juror bias "may be upheld even in the absence of clear statements from the juror that he or she is impaired" from imposing the death sentence. *Uttecht v. Brown*, 551 U.S. 1 at 7 (citing *Witt*, 469 U.S. at 424-25.)

In *Uttecht*, the Supreme Court determined four relevant principles from its precedent: (1) "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause[;]" (2) "the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes[;]" (3) "to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible[;] and (4) "in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts." 551 U.S. at 9 (citing *Witherspoon*, 391 U.S. at 521, and *Witt*, 469 U.S. at 416, 424-34.)

Each of the prospective jurors identified by Petitioner who were removed for cause stated they could not, or did not think they could, impose the death penalty in an appropriate case or in all cases. In no instance was a prospective juror struck based solely on a generalized objection to the death penalty. For those who stated that they "did not think" they could impose the death penalty, the trial judge's credibility determination on whether to excuse the juror is entitled to a presumption of correctness, which Petitioner has not overcome. *See Szuchon v. Lehman*, 273 F.3d 299, 328 (3d Cir. 2001) (holding that because it is the trial judge's duty to determine whether a

challenge for cause against a prospective juror is proper, and the trial judge must make a factual determination whether the juror is biased, that determination is entitled to the presumption of correctness of federal habeas review.) Therefore, Petitioner's PCRA counsel was not ineffective in failing to raise trial counsel's ineffectiveness by failing to object to dismissal of these prospective jurors. Petitioner has not shown cause to establish procedural default of Ground Three, and it is dismissed.

> 4. Ground Eight: <u>Trial counsel failed to investigate the forensic evidence, including the fingerprint and blood analysis.</u>

Petitioner contends his trial counsel was unprepared to cross-exam the Commonwealth's expert, Joseph Brown, on the fingerprint evidence, and he asked only ten questions on cross-examination. (Pet., ECF No. 1-1, ¶66.) Petitioner submits there was information available at the time of his trial concerning the fallibility of fingerprint evidence, and his counsel did not research this information and present a more compelling cross-examination. (*Id.*, ¶67.) He also asserts that his counsel should have sought funds to have the evidence independently investigated. (*Id.*, ¶68.) Petitioner seeks to preserve his right to request DNA evidence that might exonerate him. (*Id.*, ¶71.) He notes that he has maintained his innocence from the beginning. (*Id.*, ¶64.)

Respondents maintain that this claim has never been raised in any state court, is defaulted, and without merit. (Respondents' Brief, ECF No. 105 at 155-56.) On the merits, Respondents contend Petitioner has not established prejudice because he has not asserted "how he could possibly have eliminated the fingerprint evidence, no matter how many counter-experts he hired." (*Id.*, at 156.) Additionally, Petitioner has not explained how blood or DNA testing would have potentially exonerated him. (Respondents' Brief, ECF No. 105 at 157.) Again, Petitioner seeks to excuse his procedural default based on his PCRA counsel's failure to raise appellate counsel's ineffective assistance for failing to trial counsel's failure to investigate and challenge the forensic

evidence. (Respondents' Brief, ECF No. 116 at 29.) The Court must determine whether PCRA counsel failed to raise a substantial claim of trial counsel's ineffective assistance by failing to investigate and effectively cross-examine regarding fingerprint and blood analysis. *Martinez*, 566 U.S. at 17.

The Commonwealth called Marvin Jenkins of the Philadelphia Police Department to testify about his role as a criminal evidence technician. (Respondent's Brief, Ex. J, ECF No. 105-39 at 80-98.) Jenkins responded to the crime scene on May 8, 1987 around 10:00 p.m. (*Id.* at 80-81.) He described the fuming process or "reverse type etching" he used for developing latent fingerprints. (*Id.* at 90-91.) Fingerprints taken from a carafe in the victim's bedroom matched those of Larry Rush. (*Id.* at 92-93.) The carafe and photos of the carafe were sent to FBI headquarters in Washington. (*Id.* at 93.) Jenkins also sent a photograph of fingerprints taken from the doorjamb of the victim's apartment to Joseph Brown, a fingerprint expert at the FBI Headquarters. (*Id.* at 94.) The reason Jenkins sent certain fingerprint evidence to Brown was that a fingerprint had reversed, meaning that the ridges of the fingerprint had been wiped away by the ridges on the finger and created an opposite pattern. (*Id.* at 94-95.) It is very difficult to compare it without performing "a reversal type technique." (*Id.* at 95.)

Joseph Brown testified that he is a fingerprint expert for the FBI. (*Id.* at 107-8.) He compared the fingerprints and photographs of fingerprints sent to him by Marvin Jenkins and they matched those of Larry Rush. (*Id.* at 108-114.) He demonstrated the points of comparison he used to make the identification. (*Id.* at 114-17.)

On cross-examination, Petitioner's counsel asked whether fresh prints were more easily recognizable than those taken from the crime scene later. (*Id.* at 117-18.) He also inquired whether it was easier to identify the physical fingerprint as opposed to a photograph of it, but Brown said

the opposite was true.  (*Id.* at 118.)  Defense counsel asked Brown to identify what equipment he used to analyze the fingerprint, and he used only a camera and an enlarger.  (*Id.*)  Finally, he asked whether there was a way to determine how old a fingerprint was, and Brown said there was not, nor did he know whether there was a way to tell if a fingerprint left in blood was made when the blood was fresh.  (*Id.* at 119.)

Petitioner has not identified a single question on cross examination that might have called the fingerprint identification process into question.  Without putting forth any basis to find defense counsel's cross examination was objectively deficient, Petitioner cannot establish a *Strickland* claim.  *See Strickland*, 466 U.S. at 687 (the defendant must show that counsel's performance was deficient; "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.")  PCRA counsel was not ineffective by failing to bring a meritless claim of trial counsel ineffectiveness.  Petitioner, therefore, has not established cause to excuse the procedural default of this claim.  Ground Eight is dismissed.

5.    Ground Thirteen:  <u>The death sentence was obtained in violation of the Sixth, Eighth and Fourteenth Amendments because it was based on an invalid aggravating circumstance.</u>

In Ground Thirteen, Petitioner asserts that the Eighth Amendment is violated when a capital jury considers an invalid aggravating circumstance in a jurisdiction where the jury must weigh aggravating and mitigating circumstances because consideration of the invalid aggravating circumstance skews the weighing process.  (Pet., ECF No. 1-1, ¶99 (quoting *Com. v. Karabin*, 559 A.2d 19, 20 (1989) ("a conviction used as an aggravating circumstance under [42 Pa. C.S.] §9711(d)(9) which is valid at the time of the sentencing proceeding, but is later reversed and vacated, renders the jury's finding of the aggravating circumstance invalid."))  Petitioner notes that his sentencing jury found two aggravating circumstances: (1) the murder was committed

during a felony, 42 Pa. C.S. § 9711(d)(6); and (2) the defendant had a significant history of felony convictions involving the use or threat of violence against the person, 42 Pa. C.S. § 9711(d)(9). (*Id.*, ¶100.)

The Commonwealth established the § 9711(d)(9) aggravating circumstance by introducing evidence of Petitioner's prior conviction for aggravated assault on Edna Nitterauer, and for prior convictions in other cases for attempted rape and robbery. (*Id.*) Petitioner appealed the Nitterauer conviction, and the Pennsylvania Supreme Court vacated and remanded for a new trial while Petitioner's case for the murder of Ms. Hands was on direct appeal. (*Id.*, ¶101.) Petitioner was reconvicted of aggravated assault against Nitterauer in June 1994. (*Id.*) His conviction and sentence in this matter were affirmed on direct appeal on August 23, 1994. (*Id.*)

Petitioner asserts that when the jury considered aggravating circumstances, it should not have considered his conviction in the Nitterauer case, because it was vacated. (*Id.*, ¶102.) He contends that if the jury had weighed his mitigating circumstances against solely the § 9711(d)(6) aggravating factor, the result "would have been significantly altered." (*Id.*) He argues his appellate counsel was ineffective for failing to alert the Pennsylvania Supreme Court on direct review. (*Id.*, ¶104.) Further, he claims the Pennsylvania Supreme Court's failure to *sua sponte* raise this issue violated the Eighth and Fourteenth Amendments by subjecting him to an arbitrary and capricious sentence of death. (*Id.*)

In opposition, Respondents assert that this claim was never raised in the state courts and there is no authority suggesting the Pennsylvania Supreme Court should have raised the issue *sua sponte*. (Respondents' Brief, ECF No. 105 at 202.) Respondents further maintain that the claim fails on the merits. (*Id.*) In addition to the Nitterauer case, the prosecution presented three prior violent felony convictions in support of aggravating factor § 9711(d)(9), including (1) the 1979

attempted rape and aggravated assault of Doris Jones; (2) the 1979 felony kidnapping and robbery of Simon Manonian; and (3) the 1987 felony robbery and indecent assault of Annamay Little and Denise Kellar. (*Id.*) Respondent also notes that the sentencing jury in this case never reached the weighing stage because they did not find any mitigating circumstances. (*Id.* at 203-04.) Even if the jury found only one aggravator and no mitigators, a sentence of death was required by 42 Pa. C.S. § 9711(c)(4) ("the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d)….") (*Id.* at 206.) Therefore, appellate counsel was not ineffective for failing to brief the issue on direct appeal. (*Id.* at 207.)

*Davila* precludes Petitioner from establishing cause and prejudice to excuse procedural default of this claim by arguing his PCRA counsel was ineffective for failing to raise appellate counsel's ineffectiveness in failing to bring this issue to the attention of the Pennsylvania Supreme Court while direct review was pending. 137 S. Ct. at 2065. Therefore, this claim is dismissed because it is procedurally defaulted.

The Court alternatively finds the claim is without merit because Pennsylvania law required the death sentence if the jury found at least one aggravating circumstance and no mitigating circumstances. 42 Pa. C.S. § 9711(c)(iv). Even if the § 9711(d) (9) aggravating factor was eliminated here, the jury found an aggravating factor under 42 Pa. C.S. § 9711(d)(6) because the murder was committed during the course of a felony, and it found no mitigating circumstances. *See Romano v. Oklahoma*, 512 U.S. 1, 13 (1994) (holding the state court did not deprive the petitioner of a fair sentencing proceeding in a capital case where one conviction that constituted an aggravating factor was vacated because three aggravating circumstances supporting the death penalty were still present and outweighed the mitigating circumstances.) Therefore, this Court alternatively denies Ground Thirteen of the habeas petition on the merits.

6. Ground Fourteen:  <u>The prosecutor committed misconduct when he urged the jury to send a message to the community by imposing a death sentence in this case.</u>

In Ground Fourteen, Petitioner complains that the prosecutor's following statement in closing argument constituted misconduct, in violation of his right to due process:

> I don't know why violence exists in this world. I don't know why there is evil, but I say to you it sits right there in that chair. And when a jury returns a verdict and when a jury imposes a sentence in a case like this, it sends a message to society and it sends a message to that individual in particular. And it says we won't tolerate that conduct anymore. We are not going to put up with this nonsense. You forfeited your right to live among the law abiding and the peaceful. And I'm asking you now to send that message to Larry Rush. Say, Larry Rush, I'm tired of it. Larry Rush, we're not going to stand for it anymore. Larry Rush, we sentence you to death.

(Pet., ECF No. 1-1, ¶¶105-6, (citing NT 6/29/88 at 62-63.))  Petitioner asserts that "send a message" arguments are impermissible because they give a false impression that there is a shared community consensus on what punishment is appropriate.  (*Id.*, ¶106.)  He concludes that his counsel was ineffective for failing to object, and the trial court erred by not *sua sponte* correcting the error.  (*Id.*, ¶107.)

Respondent asserts this claim was never raised in any state court and is procedurally defaulted.  (Respondent's Brief, ECF No. 105 at 207.)  Respondent also argues the claim is without merit because the comments were responsive to defense counsel's closing argument that capital punishment has no deterrent effect in society at large.  (*Id.* at 209-10.)  Moreover, the prosecutor did not ask the jury to send a message to the community, but to send a message to Petitioner, which is permissible.  (*Id.* at 210-11 (citing *Com. v. Patton*, 985 A.2d 1283, 1288 (Pa. 2009) ("Prosecutorial remarks encouraging a jury to 'send a message' to the defendant, rather than the community or criminal justice system, do not invite consideration of extraneous matters and are not misconduct."))  Petitioner contends that PCRA counsel's failure to allege ineffectiveness of

trial counsel for not objecting to the statement in closing argument excuses his procedural default. (Petr's Reply Brief, ECF No. 116 at 37.)  Thus, this Court must determine whether PCRA counsel failed to raise a substantial claim of trial counsel ineffective assistance by failing to object to this statement by the prosecutor in closing argument.  *Martinez*, 566 U.S. at 17.

To establish a due process violation based on a prosecutor's remarks in closing argument, the petitioner must establish, based on examination of the entire proceedings, that the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.  *Parker v. Matthews*, 567 U.S. 37, 45 (2012);  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

When the prosecutor's comment is taken in context it was a brief remark along with repeated statements that the jury should send a message to Petitioner that his repeated acts of violence would not be tolerated.  The jury found two aggravating factors, one involving Petitioner's repeated crimes of violence.  It is unlikely that the jury was swayed to impose the death penalty because the prosecutor suggested it is the punishment society demands. It is more likely the jury found the necessary aggravating factors and lack of mitigating factors necessary to impose a sentence of death, and in that context, it was sending Petitioner a message that his behavior could not be tolerated.

Prejudice that is required to excuse procedural default is shown where the errors at trial "worked to [Petitioner's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Murray*, 477 U.S.  at 488 (quoting *Frady*, 456 U.S. at 172 (1982). Petitioner cannot establish that counsel's failure to object to this statement undermined confidence in the outcome of the penalty phase of trial. Therefore, Petitioner has not established cause to excuse procedural default.  Ground Fourteen is dismissed.

7.    Ground Fifteen: <u>The reasonable doubt instruction was unconstitutional</u>.

In Ground Fifteen, Petitioner asserts his right to due process was violated by the definition of reasonable doubt provided in the jury instructions at both the guilt and penalty phases of trial. (Pet., ECF No. 1-1, ¶¶109-15.)  Petitioner alleges the following instruction was improper, "[a] reasonable doubt is such a doubt as would cause a reasonable person to refrain from acting in a matter of importance in his or her own life." (*Id.*, ¶109, quoting NT 6/29/88 at 82-83 and NT 6/29/88 at 66.)  Pennsylvania's standard reasonable doubt instruction, which has been approved by the U.S. Supreme Court, is "[a] reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his own affairs." (*Id.*, ¶¶110-11.)  Petitioner contends use of the word "refrain" in the jury instructions instead of the word "hesitate" reduced the Commonwealth's burden of proof and violated his due process rights and the Eighth Amendment. (*Id.*, ¶¶112-15.)

Respondent contends the claim is procedurally defaulted and without merit. (Respondent's Brief, ECF No. 105 at 158-62.)  The reasonable doubt instruction here was almost identical to that approved by the Third Circuit in *Thomas v. Horn*, 570 F.3d 105 (3d Cir. 2009); reasonable doubt is "such a doubt as would cause a reasonable person to restrain from acting in a matter of great importance in his or her own life." (*Id.*, ECF No. 105 at 159-60.)  Respondents assert use of the word "refrain" instead of "restrain" by the court here was simply a grammatical correction from the instruction long approved in Pennsylvania courts, because a person "refrains from acting" rather than "restrains from acting." (*Id.* at 160.)  In any event, Respondent notes that in *Victor v. Nebraska*, 511 U.S. 1, 5 (1994), the Supreme Court approved a reasonable doubt instruction that defined reasonable doubt as one which would cause a person "to hesitate," but further noted that "the Constitution does not require that any particular form of words be used," as long as the

instructions, taken as a whole "correctly conve[y] the concept of reasonable doubt to the jury." (*Id.* at 161-62, quoting *Victor*, 511 U.S. at 5.)

Petitioner responds that PCRA counsel should have raised appellate counsel's failure to raise a due process claim, and trial counsel's failure to object to the instruction. (Petr's Reply Brief, ECF No. 116 at 39-40.) This Court must determine whether PCRA counsel failed to raise a substantial claim that trial counsel's performance was deficient for failing to object to an erroneous jury instruction. *Martinez*, 566 U.S. at 17.

To obtain relief on a claim that an erroneous jury instruction violated a defendant's right to due process, a petitioner must establish that the error so infected the entire trial with unfairness as to deprive him of due process, which requires more than a finding that the instruction was "undesirable, erroneous, or even 'universally condemned.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Donnelly*, 416 U.S. at 643). "The Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Victor*, 511 U.S. at 5. "Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.'" *Id.*, quoting *Holland v. United States*, 348 U.S. 121, 140, (1954)).

In this case, the trial court explained that "reasonable doubt is an honest and genuine doubt arising solely from the evidence or lack of evidence." (Respondents' Brief, Ex. L, ECF No. 105-57 at 82.) Although defining a reasonable doubt as one that would cause a reasonable person to "restrain from acting" might place a lower burden of proof on the prosecution than a doubt which would cause a reasonable person "to hesitate from acting," the reasonable doubt instruction as a whole did not fatally infect the entire trial with unfairness. *See Thomas*, 570 F.3d at 118 ("it does not follow that any definition [of reasonable doubt] requiring more doubt [than that which would cause a person to hesitate to act] is unconstitutional" because the reasonable doubt instruction must

be taken as a whole.)  Therefore, cause and prejudice based on PCRA's counsel's failure to bring a claim of trial counsel's ineffectiveness by failing to object to the jury instruction does not excuse the procedural default of this claim.  Ground Fifteen is dismissed because it is procedurally defaulted.

8.    Ground Sixteen:  <u>The prosecutor committed misconduct by invading the province of the jury when he argued the jury should disregard mitigating evidence presented by the defense at the time of sentencing in violation of Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments.</u>

Petitioner asserts that the following statement by the prosecutor in closing argument violated his constitutional rights by urging the jury to ignore mitigating factors in consideration of the death penalty:

> And now he's pleading with you, please spare my life. I'm poor, I'm black, I'm uneducated. All those witnesses you heard, including Jerry McEachin at trial, came from the same environment he came from. And they're fine, law abiding people, and they are not violent. So that is no excuse. It's not mitigation.

(Pet., ECF No. 1-1, ¶¶116-17, quoting NT 6/29/88 at 62.)  Poverty and deprivation as a child are mitigating factors under Pennsylvania law.  (*Id.*, ¶118.)  Petitioner admits the claim was unexhausted but contends all prior counsel were ineffective for failing to object. (*Id.*)  Respondents argue the claim is procedurally defaulted and the underlying prosecutorial misconduct claim is meritless because the prosecutor is permitted to argue the jury should not attach substantial weight to the mitigating circumstances that were presented.  (Respondent's Brief, ECF No. 105 at 217-18.)

The Court must determine whether PCRA counsel's failure to raise trial counsel's ineffectiveness for failing to object constitutes cause and prejudice exist to excuse the procedural default of this claim under *Martinez.*  *See Davila,* 137 S. Ct. at 2061 ("If an unpreserved trial error was so obvious that appellate counsel was constitutionally required to raise it on appeal, then trial

counsel likely provided ineffective assistance by failing to raise it at trial. In that circumstance, the prisoner likely could invoke *Martinez* or *Coleman* to obtain review of trial counsel's failure to object.") To establish a due process violation based on a prosecutor's remarks in closing argument, the petitioner must establish, based on examination of the entire proceedings, that the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Parker, 567 U.S. at 45 (2012)*; *Darden*, 477 U.S. at 181 (1986); *Donnelly,* 416 U.S. at 643.

The prosecutor was incorrect when he stated that poverty and lack of education are "not mitigation," because one of the statutory mitigating factors for the death penalty in Pennsylvania is "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa. C.S. § 9711(e)(8). The prosecutor's closing argument, however, must be viewed in the overall context of the proceedings. In the penalty phase jury instructions, the trial judge read the statutory mitigating factors to the jury, including that the jury could consider "any other evidence of mitigation concerning the character and record of the Defendant and the circumstances of the offense." (Respondents' Brief, Ex. N, ECF No. 105-59, at 66-67.) Further, the mitigating factors were provided to the jury in writing. (*Id.* at 67.)

In context, it is very likely the jury understood the prosecutor's statement that "it's not mitigation" was not meant to be taken literally but instead that the mitigation evidence should not be given any weight, which is a proper argument in closing. *See United States v. Johnson*, 495 F.3d 951, 978 (8th Cir. 2007), *cert. denied*, 555 U.S. 828 (2008) (stating the government may dispute mitigating factors and argue they should receive little or no weight). Therefore, the prosecutor's statement did not so infect the trial with unfairness as to deprive the defendant of due process.

Trial counsel was not deficient for failing to raise an unmeritorious due process objection to counsel's closing argument, and PCRA counsel was not ineffective for failing to raise trial counsel ineffectiveness. Petitioner has not shown cause and prejudice to excuse procedural default of this claim. Ground Sixteen is dismissed.

9. *Pro Se* Claims XVII through XXII

As discussed above, Petitioner presents his *pro se* habeas claims with the following explanation:

> Throughout the many years of state court litigation Petitioner has raised a number of claims that are either facially deluded, or for which there is no apparent record, or extra-record support. Counsel sets forth the following claim headings because, given Petitioner's inability to cooperate with counsel, along with counsel's lack of knowledge about the facts that may underlie these claims, counsel is reluctant to waive any claim – even those that appear on their face to be the product of a disturbed mind.

(Pet., ECF No. 1-1 at 60.) The claim headings are as follows:

> XVII. All prior counsel conspired with Commonwealth to alter transcripts to prevent Petitioner from raising constitutional claims of merit. This was ineffective. Appellate [sic] could not adequately brief the issues without the one true copy.

> XVIII. Trial counsel failed to investigate and present available evidence from the alleged jeweler who bought proceeds from the crime to contradict testimony from a key witness for the prosecution, Jerry McEachin.

> XIX. Counsel failed to investigate, develop and present evidence that Detective James Morton falsified evidence against Petitioner through a key witness for the prosecution, Jerry McEachin.

> XX. Appellate counsel had [a] direct conflict of interest with Petitioner when he responded to Petitioner's allegations of the transcript alteration by calling the allegation "absolutely asinine."

> XXI. PCRA Counsel ineffective because he briefed (unknown to Petitioner) issues without benefit of the true trial transcript.

XXII. Petitioner was denied equal protection rights because he was not permitted to represent himself in the way that other prisoners are permitted to represent themselves. The Prothonotary intruded in the case and would not accept filings or would forward the filings to counsel that Petitioner did not acknowledge, both and direct appeal and PCRA.

(Pet., ECF No. 1-1 at 60-61.)

Respondents contend these claims, except Ground XXI, which is not cognizable on habeas review,[21] are procedurally defaulted because they were not raised in the state courts and are also without merit. (Respondent's Brief, ECF No. 105 at 218-227.) Respondents state that Ground XVII, the alteration of the trial transcript, does not demonstrate that Petitioner was delusional because there were many errors in the trial transcript, but the errors "had no effect on fairness." (*Id.* at 219-20.) The only meaningful error was corrected by the trial court. (*Id.*) Respondents compiled a partial list of such errors, which includes, for example:

> N.T. 7/3/87 (Exhibit B):
> > page 5: victim's name spelled "Vernica" – should be "Veranica"
> > page 17: "gave it to Tiny" should be "gave it to Tyree"
> > page 17: "Tiny left the house" should be "Tyree left the house"
> See N.T. 6/24/88 at 51 for discussion of "Tiny" / "Tyree" errors
> See also N.T. 6/28/88 at 50 (defense counsel's argument re these errors)
>
> N.T. 2/19/88 (Exhibit D):
>
> > page 2 line 16: the question mark should be a period.
> > page 3 line 12: the period should be a question mark.
> > page 3 line 21: "to to" should read "to do"
> > page 4 line 19: the period should be a question mark.
> > page 6 line 21: "covered" should be "discovered"
> > page 7 line 19: "his" should indicate petitioner's, not McEachin's

---

[21] Ineffective assistance of post-conviction counsel is not a basis for federal habeas relief. 28 U.S.C. § 2254(i); *Martinez*, 566 U.S. at 17.

page 8 line 4: missing a comma between "pockets" and "producing"

page 8 line 5: "identified as Melvin" should read "identified by Melvin"

page 8 line 11: "him" refers to McEachin

page 8 line 23: missing comma: "disarray, not in keeping"

page 9 line 7: " – which she wore" (the bracelet, not the nighttable)

page 9 line 9: missing comma, wrong word: "showered, also evincing"

page 10, line 11: "in" should be "into"

page 11 lines 2-3: should read: "—as had the decedent in this case –"

page 14 line 2: spelling should be "Shelton" not "Shelkin"

page 14 lines 15-21: some error here, not clear what was said

page 21 line 5: word "maybe" should read "may be"

page 21 line 14: missing "is"; should read "argument is that"

page 21 line 25: should be "Bryant" not Brian

page 22 line 12: "even in" should read "even if"

page 22 line 13: should read "crimes are similar, the"

page 22 line 14: "argument that" should read "argument is that"

page 23 line 9: "is that a man" should read "is a man"

page 24 line 5: "was locked" should read "was unlocked"

page 24 line 17: "have both cases" should read "have in both cases"

page 25 line 20: "I had the same" should read "I did the same"

page 26 line 2: "I had it before" should read "I did it before"

page 26 line 17: missing "in"; should read: "evidence in the homicide"

(ECF No. 105 at 220-21.)  Respondent contends that although there were many inconsequential errors, and Petitioner's attorneys were not ineffective for failing to raise the issue, Petitioner was not incompetent because he tried to assert the notes of testimony were altered.  (*Id.* at 223-24.)

Petitioner replies that these *pro se* claims were offered to support his incompetence to proceed *pro se*, not as claims to be decided here on the merits.  (Petr's Reply Brief, ECF No. 116 at 41.)  Petitioner notes that his allegation of a vast conspiracy to change 90% of the trial transcript

to convict an innocent man has nothing to do with the typographical, syntactical, grammatical, and technical corrections highlighted by Respondents. (*Id.*)

Here, the parties agree Petitioner's *pro se* claims lack merit. The only dispute is whether the nature of these claims is evidence that Petitioner was incompetent to represent himself on PCRA remand, which the Court addresses below.

> C. Claims that Were Not Raised Through One Complete Round of the State's Appellate Review Process
>
> 1. Ground Six: <u>Trial counsel unreasonably failed to disclose the fact that he had been a special prosecutor, denying Rush the opportunity to assess whether his counsel was laboring under a conflict of interest</u>.

Petitioner alleges his trial counsel, Richard Brown, served as a special assistant state attorney general in a 1988 murder trial involving the shooting of a court officer by Diani Brown. (Pet., ECF No. 1-1, ¶59.) The Philadelphia District Attorney's Office recused itself from the case, and Richard Brown prosecuted the case as Special Assistant State Attorney General. (*Id.*) Brown did not disclose that he was serving as a special prosecutor for the same office that prosecuted Petitioner. (*Id.*, ¶60.)

Respondents oppose this claim as defaulted and without merit. (Respondents' Brief, ECF No. 105 at 142-50.) Petitioner raised this claim in a *pro se* PCRA petition, which was later amended by counsel to exclude this claim. (*Id.* at 143.) Under Pennsylvania law, a counseled PCRA petition supersedes a *pro se* petition. (*Id.*) Petitioner also tried to bring this claim when he filed a *pro se* amended PCRA petition in 2005, but the PCRA petition violated the Pennsylvania Supreme Court's limitation of the scope of remand to the PCRA court. (*Id.* at 144.) Therefore, this claim was not properly raised, and it is now too late to raise it, making it procedurally defaulted. (*Id.*)

On the merits of the claim, Respondents assert that the Philadelphia District Attorney's Office recused itself from the case in which Brown was appointed a Special Assistant Prosecutor for the State Attorney General in 1987, pursuant to 71 P.S. § 732-205(a)(3).  (Respondents' Brief, ECF No. 105 at 145-46 (citing Exhibits VVV-AAAA, ECF No. 105-123 through ECF No. 105-128.))  The stipulated trial occurred on May 4, 1988, with sentencing in September 1988.  (*Id.* at 146 (citing Exhibits WWW, YYY, and ZZZ.))

In reply, Petitioner contends he can show cause and prejudice to excuse procedural default because PCRA counsel failed to raise appellate counsel failure to raise trial counsel's failure to disclose the conflict.  (Respondents' Brief, ECF No. 116 at 25-26.)

Ground Six is procedurally defaulted.  In Pennsylvania, a first-time petitioner is entitled to PCRA counsel.  *Com. v. Privolos*, 746 A.2d 621, 623 (Pa. Super. 2000) (citing *Com. v. Hampton*, 718 A.2d 1250, 1253 (Pa. Super. 1998).  Once appointed, PCRA counsel has a duty "to either (1) amend the petitioner's *pro se* petition and present the petitioner's claims in acceptable legal terms or (2) certify that the claims lack merit…"  *Id.*  Thus, an amended PCRA petition supersedes a *pro se* petition, and Petitioner did not exhaust the claim by raising it in his *pro se* PCRA petition.

The claim is now procedurally defaulted because it is too late for Petitioner to assert in state court that his PCRA counsel was ineffective for failing to raise his *pro se* claims in the amended PCRA petition.  *See Whitney v. Horn*, 280 F.3d 240, 251 (3d Cir. 2002) ("A claim in a PCRA petition that trial counsel and previous post-conviction counsel were ineffective for failing to raise an issue is also subject to the time bar [under 42 Pa. C.S. §9545(b)(1)]")

To establish cause for procedural default, a petitioner must show that the ineffective assistance of trial counsel claim is substantial, and that PCR counsel performed below constitutional standards in not raising the claim.  *Martinez*, 566 U.S. at 15-16.

Brown was appointed to prosecute a murder case as a Special Assistant State Attorney General; he did not work for the Philadelphia District Attorney's Office. (Respondents' Brief, Exhibits VVV-AAAA, ECF No. 105-123 through 105-128.)

71 P.S. § 732-205(a)(3) provides:

(a) Prosecutions.--The Attorney General shall have the power to prosecute in any county criminal court the following cases:

. . .

> (3) Upon the request of a district attorney who lacks the resources to conduct an adequate investigation or the prosecution of the criminal case or matter or who represents that there is the potential for an actual or apparent conflict of interest on the part of the district attorney or his office.

"While a district attorney has control over deputy or assistant district attorneys because they are subordinates, such would not be the case with the attorney general, who would not be subject to the same supervision. In the absence of such control, the attorney general cannot be said to be a mere agent of the district attorney." *Commonwealth v. Khorey*, 555 A.2d 100, 110 (Pa. 1989). Similarly, district attorneys in Pennsylvania are autonomous from the Pennsylvania Attorney General. *See Carter v. City of Philadelphia*, 181 F.3d 915, 353-54 (holding that "Pennsylvania's consciously and deliberately designed autonomous role for its district attorneys" weighed against finding the District Attorney's Office an arm of the state); *see Com. v. Breighner*, 684 A.2d 143, 148 (Pa. Super. 1996) (where a district attorney has a conflict in a case, the matter must be referred to the Attorney General.)

Petitioner's claim that Brown suffered a conflict by defending him against a case prosecuted by the Philadelphia District Attorney's Office while serving as a Special Assistant Attorney General to prosecute a murder trial is without merit. *See Com. v. Harris, 460 A.2d 747, 749 (Pa. 1983)* (conflict of interest with the district attorney was cured by referring the case to the

Attorney General's Office for prosecution.) Petitioner has not established cause for procedural default of this claim. Ground Six is dismissed as procedurally defaulted.

2.    Ground Seven:  <u>Trial counsel unreasonably failed to investigate and present evidence of Rush's alibi defense.</u>

In support of Ground Seven, Petitioner contends he provided police with a statement detailing his whereabouts during the time the victim was killed, and he informed his counsel that his girlfriend, Georgette Sims, would corroborate his statement. (Pet., ECF No. 1-1, ¶62.) Defense counsel did not call Sims to testify. (*Id.*) Petitioner acknowledges that Sims was expected to testify, for the Commonwealth, that Rush asked her to lie to protect him. (*Id.* at 30, n. 7.) The Commonwealth, however, did not call Sims to testify. (*Id.*) Petitioner's counsel told him that Sims could not be located before trial. (*Id.*)

Respondents argue that this claim was never properly presented in state court. (Respondents' Brief, ECF No. 105 at 150.) Petitioner raised the claim in a 1997 *pro se* PCRA petition that was superseded by a counseled amended petition on September 17, 1997. (*Id.* at 140.) Petitioner attempted to raise the claim again in his *pro se* 2005 amended PCRA petition. (*Id.*) This claim was outside the scope of the PCRA remand and was not reviewed by the state courts. (*Id.*) The PCRA time-bar precludes Petitioner from now exhausting the claim in state court. (*Id.*)

Respondents assert the claim also fails on the merits because Sims gave five statements to police, including that Petitioner unsuccessfully attempted to persuade to give a false alibi covering the time of the murder. (Respondents' Brief, Exhibit KKK, ECF No. 105-111 at 137-39, 105-112 at 1-4, 56-70, 107-110.) Petitioner replied that his PCRA counsel was ineffective in failing to raise trial counsel's ineffectiveness by failing to raise this claim, providing cause and prejudice to excuse the procedural default. (Petr's Reply Brief, ECF No. 116 at 27.)

For the same reasons discussed under Ground Six, Ground Seven is also procedurally defaulted. To excuse procedural default, Petitioner must assert that his PCRA counsel was ineffective by failing to raise a substantial claim of trial counsel's ineffectiveness for failing to investigate and present an alibi defense. *Martinez*, 566 U.S. at 15-16.

First, Petitioner acknowledges that his trial counsel tried to locate Sims but could not. In the absence of facts indicating that the witness could have been found upon reasonable investigation, counsel is not deficient because he could not locate an alibi witness. Second, Petitioner acknowledges that the prosecution intended to call Sims as a witness to testify that Petitioner asked her to lie for him. If the defense had called Sims as an alibi witness, there is little doubt the Commonwealth would have impeached her with her earlier statement that Petitioner asked her to lie to provide him with an alibi. Trial counsel was not ineffective for failing to call a witness that likely would have caused more harm than good for the defense. *See McAleese v. Mazurkiewicz*, 1 F.3d 159, 168 (3d Cir. 1993) (trial counsel's decision not to call an alibi witness was not ineffective assistance where the alibi witness might have destroyed defendant's image as a "model citizen.")

The Court dismisses Ground Seven of the habeas petition because it is procedurally defaulted, and Petitioner has not established cause and prejudice to excuse the default.

D.     Claims that Were Presented Differently in the Habeas Petition from What Was Presented in the State Courts.

1.     Ground Four:  Whether the prosecutor exercised peremptory challenges in a race and gender discriminatory manner in violation of the Sixth, Eighth and Fourteenth Amendments; and whether all prior counsel were ineffective in failing to properly raise and litigate this issue.

In Ground Four of the petition, Petitioner seeks to establish a prima facie case that the prosecutor discriminatorily exercised peremptory challenges to strike African-Americans and

female jurors, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986) and *J.E.B. v. Alabama*, 511 U.S. 127 (1994). (Pet., ECF No. 1-1, ¶40.) Petitioner alleges a pattern of disproportionate strikes against African-Americans and women, and a policy of discrimination based on the Philadelphia District Attorney's training materials from lectures given by Attorneys Jack McMahon and Bruce Sagel (the "McMahon Training Tapes.") (*Id.*, ¶41.) Petitioner has now determined the race of the jurors from voter registration materials and proffers the following:[22]

> Jury selection began on June 20, 1988 and concluded on June 22, 1988. Commonwealth used eighteen (18) peremptory strikes. A statistical review of the prosecutor's strikes in this case raise[s] a strong inference of race and gender discrimination:
>
> > •There were forty-two jurors in the pool from which the prosecution accepted or peremptorily struck prospective jurors.
> >
> > •Of these forty-two jurors fifteen were African American.[23]
> >
> > •Of the fifteen African Americans strike eligible by the prosecution, eleven were struck. Thus, the prosecutor struck two-thirds of the African Americans he had the opportunity to strike.
> >
> > • Conversely, the prosecutor in this case had the opportunity to strike twenty-seven whites, but struck only seven. Thus, the prosecutor struck only one-fourth of the Whites he had the opportunity to strike.
> >
> > • Of the forty-two jurors, there were twenty-five men and seventeen women.
> >
> > • Of the twenty-five men the prosecutor had the opportunity to strike, he struck eight.
> >
> > •On the other hand, of the seventeen women the prosecutor had the opportunity to strike, he struck ten.

---

[22] Rush's counsel obtained the voter registration polls in preparation for the instant petition, and the information is not contained in the state court record. (Petr's Brief, ECF No. 86 at 35 n. 7.)

[23] Therefore, 36% of the venire pool was African-American.

• Women were struck at a rate of almost 2:1.

(Pet., ECF No. 1-1, ¶43.)  In further support of his claim of a pattern and practice of discrimination by the Philadelphia District Attorney's Office, Petitioner alleges in the detail the content of the McMahon Training Tapes. (*Id.*, ¶¶45-55.)  Petitioner further argues trial counsel could have had no reasonable strategy in failing to object to the prosecutor's strikes.  (*Id.* at 44.)  Petitioner contends that his appellate counsel was ineffective for failing to present a prima facie case on direct appeal.  (*Id.*)

In opposition, Respondents note that there was no *Batson* objection at trial in 1988, two years after *Batson* was decided.  (Respondents' Brief, ECF 105 at 117.)  Respondents submit that the state court record is silent as to the race and sex of the panel or the jury members, except one statement by the prosecutor.  (*Id.* at 118.)  Two years after trial, the prosecutor recalled that the jury was made up of seven white jurors and five black jurors.  (*Id.* at 119.)  In post-trial motions, Petitioner had argued that the prosecutor systematically excluded black male jurors from the panel, but he presented no evidence of such.  (*Id.* at 118-20.)  Then, on direct appeal, Petitioner alleged ineffective assistance of counsel for failure to raise a race-only *Batson* claim.  (*Id.* at 20.)  The Pennsylvania Supreme Court rejected the claim for failure to establish a prima facie case.  (*Id.*)  Respondents also note Petitioner had alleged in state court that the prosecution struck fourteen jurors based on race, and now he alleges that the prosecutor struck eleven African-American jurors. (*Id.* at 121.)

Respondents contend that the Pennsylvania Supreme Court reasonably found a prima facie case had not been established because there was no evidence in the record of the racial composition of the jury pool or jurors struck.  (*Id.* at 120.)  The Pennsylvania Supreme Court also found that counsel was not ineffective for failing to raise a meritless *Batson* claim.  (*Id.*)

As to Petitioner's *J.E.B.* claim for using peremptory challenges to strike women, Respondents note this is the first time Petitioner raised this claim in any court. (*Id.* at 121.) Respondents contend that not only is the *J.E.B.* claim unexhausted and procedurally defaulted, it lacks merit on the basis that Petitioner originally raised a claim in post-verdict motions that the prosecutor struck all black males, suggesting there was no discrimination against females. (Respondents' Brief, ECF No. 105 at 132.) Furthermore, Petitioner has not provided copies of the voter registration records used to proffer a prima facie case of discrimination for the *Batson* or *J.E.B.* claims. (*Id.*)

Respondents assert the *Batson* claim was never raised at trial, which renders it defaulted and forfeited "as a matter of substantive *Batson* law" because a contemporaneous objection to the prosecutor's exercise of peremptory challenges is a prerequisite to a *Batson* claim. (*Id.* at 121, citing *Lark v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 596, 608 (3d Cir. 2011); *Lewis v. Horn*, 581 F.3d 92, 101-102 (3d Cir. 2009); *Abu-Jamal v. Horn*, 520 F.3d 272, 284 (3d Cir. 2008), *vacated on other grounds sub nom., Beard v. Abu-Jamal*, 130 S. Ct. 1134 (2010); *see Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (nature of strikes requires contemporaneous evaluation)). Respondents also contend that *Strickland* claims about trial counsel's failure to make a contemporaneous *Batson* objection and post-conviction counsel's failure to seek an evidentiary hearing are legally and factually different from raising a *Batson* claim, and do not serve to exhaust the *Batson* claim. (*Id.* at 123.)

Furthermore, Respondents contend the Philadelphia District Attorney's training materials were available as early as 1997, yet Petitioner never presented this claim in state court, and habeas review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim. (*Id.* at 126 (citing *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011)).

In reply, Petitioner maintains his *Batson* claim was exhausted because "[a] *Batson* claim, challenging the strikes of Black men and women from the venire pool, and the associated ineffective assistance of trial counsel claim were reviewed by the Pennsylvania Supreme Court on direct appeal." (Petr's Reply Brief, ECF No. 116 at 20.) Petitioner argues the Pennsylvania Supreme Court's decision was contrary to or an unreasonable application of Supreme Court law because it concluded his *Batson* claim failed because this "was not a racially-sensitive case." (Petr's Reply Brief, ECF No. 116 at 20.) Petitioner asserts *Batson* applies even when the defendant and the victim are members of the same race because a "defendant [has] the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." (*Id.*, quoting *Batson*, 476 U.S. at 85-86.)

Next, Petitioner contends his proffer that the prosecutor struck two-thirds of the African-American venire pool members and only 26% of the Caucasian venire pool members is sufficient to support a prima facie *Batson* claim. (*Id.* at 20-21.) Petitioner claims he is entitled to a hearing pursuant to § 2254(e) to further develop his *Batson* claim, "an opportunity that the state courts denied" him. (*Id.* at 21.) Petitioner contends any procedural default of his *Batson* and *J.E.B.* claims should be excused because post-conviction counsel was ineffective by failing to raise all substantial claims of appellate counsel's ineffectiveness. (*Id.* at 21-23.)

In sur-reply, Respondents contend a federal evidentiary hearing is prohibited because Petitioner did not seek to develop the claims in state court. (Respondents' Sur-reply, ECF No. 120 at 14.)

In *Batson*, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson*

*v. Kentucky*, 476 U.S. 79, 89 (1986). "[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* at 97. "The court must then determine whether the defendant has carried his burden of proving purposeful discrimination." *Coombs v. Diguglielmo*, 616 F.3d 255, 261 (3d Cir. 2010) (citing *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citing *Batson*, 476 U.S. at 98)). The court must consider "all of the circumstances that bear upon the issue of racial animosity." *Id.* (quoting *Synder v. Louisiana*, 552 U.S. 472, 478 (2008)). In *J.E.B.*, the Supreme Court extended the *Batson* test to gender-based discrimination in jury selection. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). Petitioner's trial counsel did not raise a *Batson* or *J.E.B.* objection.

In post-verdict motions, Brown raised a *Batson* claim, arguing that all black male jurors were routinely struck by the prosecutor. (*Id.*, Ex. O, ECF No. 105-61 at 11-12.) Although Brown filed the post-verdict motions, he was replaced as defense counsel by Attorney Savino, who argued the motions before the court. (*Id.* at 11.) Savino was unable to determine from the record the racial makeup of each perspective venire-person. (*Id.* at 12.) The prosecutor recalled that there were seven white jurors and five black jurors. (*Id.*) The trial judge recalled only that some black jurors were chosen. (*Id.* at 12-13.) Savino noted that his allegation was that all black males were excluded, and the trial judge had no recollection if that was true. (*Id.* at 13.) The court denied the motion. (*Id.* at 14.)

Petitioner cannot establish a *Batson* claim for habeas review because "a timely objection at trial is required to preserve a *Batson* claim." *Lark*, 645 F.3d at 607. The same is true for a *J.E.B.*

claim. *See J.E.B.*, 511 U.S. at 144-45 ("As with race-based *Batson* claims, a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike.)

The only *Batson*-related claims that Petitioner exhausted in state court were his claim on direct appeal that trial counsel was ineffective for failing to object to the prosecutor's use of his peremptory challenges to strike venire-persons solely on the basis of race; and his claim that post-verdict counsel was ineffective for failing to request a hearing on the matter, resulting in dismissal of the claim. (Brief for Appellant, ECF No. 105-67 at 2.) The Pennsylvania Supreme Court held that:

> Trial counsel would have had no right to an explanation for the prosecution's use of its peremptory challenges unless a prima facie case of discrimination had first been established. Nothing in the record indicates that counsel could have established such a case.
>
> This was not a racially sensitive case. No racial issues were involved. Both appellant and the victim were black. Many of the witnesses presented by the prosecution and the defense were black. Appellant was convicted by a jury on which both blacks and whites were represented.
>
> Although trial counsel did not challenge the prosecution's use of its peremptory challenges, post-verdict counsel did raise the issue. The trial court ruled that the issue was meritless, reasoning that the defense failed to make a showing that the prosecution intentionally excluded black jurors. The court noted, "While the record does not disclose the racial composition of the jurors, this court specifically recalls that black jurors were selected." As we stated in *Commonwealth v. Young*, 536 Pa. at 69, 637 A.2d at 1319, "The trial court's determination as to discriminatory intent is a finding of fact and must be accorded great deference on appeal." We have examined the record and find no basis to disagree with the trial court's conclusion. Counsel was not, therefore, ineffective for failing to pursue this issue.

*RUSH I*, 646 A.2d at 564.

To establish an ineffective assistance of counsel claim, "[t]he second prong of the *Strickland* analysis of whether an attorney was ineffective requires [courts] to determine if but for the attorney's error the result of the proceeding probably would have been different." *Gov't of Virgin Islands v. Forte*, 865 F.2d 59, 63–64 (3d Cir. 1989). In the context of a *Batson* claim, the question of prejudice is "what would have happened had the *Batson* objection been made?" *Id.* at 63. Petitioner suggests a prima facie case of discrimination could have been established based on his proffer from the voter registration records, but he makes no argument that the prosecutor could not have offered a race-neutral explanation for any of the strikes, nor that he could have overcome any race-neutral explanation.

Even if this Court looked outside the state court record and accepted Petitioner's proffer, the evidence is insufficient to establish prima facie discrimination based on race. "Establishment of a prima facie case requires the defendant to show that 'the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Williams v. Beard*, 637 F.3d 195, 214–15 (3d Cir. 2011) (quoting *Johnson v. California*, 545 U.S. 162, 168 (2005) (quoting *Batson*, 476 U.S. at 93–94.))

> First, the defendant may proffer evidence that the government exercised a "'pattern' of strikes against black jurors included in the particular venire, [which] might [then] give rise to an inference of discrimination." *Batson*, 476 U.S. at 97, 106 S.Ct. 1712. Second, "the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Id.*

*Id.* at 215.

Here, Petitioner contends the Commonwealth exercised a pattern of strikes against black jurors based on the racial information obtained from the voter registration polls, indicating that

eleven of fifteen African-American jurors [73%] were struck and only seven of twenty-seven white jurors [26%] were struck.

> The Supreme Court has found prima facie *Batson* cases based on a pattern of discrimination, but only where the trial record has indicated both the strike rate and the racial composition of the venire. The strike rate is computed by comparing the number of peremptory strikes the prosecutor used to remove black potential jurors with the prosecutor's total number of peremptory strikes exercised. This statistical computation differs from the "exclusion rate," which is calculated by comparing the percentage of exercised challenges used against black potential jurors with the percentage of black potential jurors known to be in the venire.

*Abu-Jamal v. Horn*, 520 F.3d 272, 290 (3d Cir. 2008), *cert. granted, judgment vacated sub nom. on other grounds, Beard v. Abu-Jamal*, 558 U.S. 1143 (2010)).

In *Lewis*, 581 F.3d at 103, the Third Circuit noted it had never held that striking ten of fifteen jurors based on race was alone sufficient to establish a prima facie case. The Third Circuit had found prima facie cases where more than 85% of the jurors of the defendant's race were struck, but it had not found a prima facie case where 66.67% of the jurors of the defendant's race were struck. *Id.*

Here, based on Petitioner's proffer, the strike rate of African-American jurors was 61%, where eleven of eighteen peremptory challenges were used on African American jurors, and 39% of peremptory challenges were used on white jurors. The exclusion rate of African American jurors was 73%, where eleven peremptory challenges were used against fifteen African American jurors in the venire pool. These percentages are significantly lower than those relied on by the Third Circuit Court of Appeals or the Supreme Court in finding statistical evidence of a pattern of discrimination.

The Supreme Court found a pattern of discrimination in *Johnson v. California*, 545 U.S. 162 (2005), where the prosecution used three of twelve peremptory challenges to remove all three black prospective jurors in the venire, an exclusion rate of 100%. *Abu-Jamal*, 520 F.2d at 290. In *Miller-El v. Cockrell*, 537 U.S. 322 (2003), the Supreme Court found a pattern of discrimination where the prosecution used their peremptory challenges to exclude 91% of the eligible African-American venire members, with a strike rate of 71% (ten of the prosecutor's peremptory challenges out of fourteen total challenges used). *Id.* (quoting *Miller-El*, 537 U.S. at 342.) Thus, Petitioner has not presented a statistical prima facie case of a pattern of discrimination in peremptory challenges.

Furthermore, like here, the petitioner in *Lewis* attempted to bolster his prima facie case using the McMahon training tapes from the Philadelphia District Attorney's Office as evidence of a pattern of discrimination. *Lewis*, 581 F.3d at 104. The Third Circuit rejected this evidence of discrimination because "concrete, case specific information" is required to establish a prima facie case. *Id.* Therefore, Petitioner has not established that either his trial counsel or his post-conviction counsel was ineffective for failing to present a prima facie *Batson* claim based on the statistics proffered by Petitioner and the McMahon training tapes. Moreover, Petitioner did not present any argument to establish *Strickland* prejudice, that the result of jury selection would have been different if the *Batson* objection had been made at trial. *See Forte*, 865 F.2d at 64 ("we do not end our analysis at the trial for we think it also clear that had the objection been made Forte would have been successful on his direct appeal in having the matter remanded for a determination of whether there had been a *Batson* violation … if *Batson* had been applied on the direct appeal we would have required the prosecutor to come forward with a neutral explanation for challenging white jurors.")

For these reasons, Petitioner's Batson and J.E.B. claims in Ground Four are denied.

**Ground Ten:**  The penalty-phase instructions violated the Eighth Amendment and all prior counsel ineffectively failed to litigate this error.

 (Pet., ECF No. 1-1, ¶¶84-88.)   In his memorandum in support of the habeas petition, Petitioner argues that the jury instructions violated *Mills v. Maryland*, 486 U.S. 367 (1988), because "viewed in the context of the overall charge" there is a "reasonable likelihood" that the jury interpreted the instructions as requiring a unanimous mitigation finding.  (Petr's Mem. ECF No. 86 at 68-72 (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)).  In support of his *Mills* claim, Petitioner claims the jury instructions, verdict form, and the rendering of the penalty verdict indicate the jury believed it had to unanimously find any mitigating circumstance before it could "give effect to that circumstance in its sentencing decision." (Petr's Mem., ECF No. 86 at 68.)

First, Petitioner asserts the following underlined sentence caused confusion over what decisions could be individual and which must be unanimous:

> The defendant does not have to prove mitigating circumstances beyond a reasonable doubt, but is only held to a lesser degree of proof known as a preponderance of the evidence.  This is a lesser burden of proof and it exists where one side is more believable than the other.  You need not be unanimous in deciding a mitigating circumstances (sic) had been proved.  If one or more of you find one or more mitigating factors have been proven, you may individually consider such a factor or factors in reaching a unanimous decision.

(*Id.* at 69, citing N.T. 6/29/88 at 67-68 (emphasis in Petr's Mem.))

Second, Petitioner argued the instruction on how to fill out the jury verdict form did not clearly explain that the jury had to be unanimous on aggravating factors but not as to the existence of the mitigating circumstances.  (Petr's Mem., ECF No. 86 at 69.)  He contends that use of the word "you," in the verdict form below, could refer to an individual or the jury as a group:

> Now, jurors, you will be given a verdict sheet upon which you will record your verdict and your findings….

> Now, should <u>you</u> find any of the aggravating circumstances apply in this case, <u>you</u> should indicate by marking the space provided for such a mark. By not marking it, it will be an indication <u>you</u> do not believe it is an aggravating circumstance.
>
> <u>You</u> should also consider the mitigating circumstances and mark the sheet accordingly if <u>you</u> find that any of the mitigating circumstances apply.  In the event that <u>you</u> find aggravating circumstances exist, and <u>you</u> also find that mitigating circumstances exist, it will be necessary to weigh one against the other….
>
> If <u>you</u> find that there are mitigating circumstances and/or aggravating circumstances, <u>you</u> are to set forth on the form what the aggravating circumstances are and what are the mitigating circumstances.

(Petr's Mem., ECF No. 86 at 69, citing N/T 6/29/88 at 69-70 (emphasis in Petr's Mem.))

Petitioner claims the verdict sheet requires the jury to find each mitigating circumstance unanimously because it opens with "<u>We, the jury</u>, having heretofore determined that the defendant, LARRY RUSH, is guilty of Murder of the First Degree, do hereby find," thus implying everything marked on the form must be found by the unanimous jury.  (*Id.* at 70-71, citing ECF No. 87-6, Appx. at 645-46.)  The verdict form also treats aggravating and mitigating circumstances identically where it states:

> We the jury have found unanimously
>
> ( )    at least one aggravating circumstance and no mitigating circumstance.  The aggravating circumstance(s) (is) (are) _ _ _ _ _ _ _ _ _ _ _ _.
>
> ( )    one or more aggravating circumstances which outweigh any mitigating circumstances.  The aggravating circumstance(s) (is) (are) _ _ _ _ _ _ _ _ _ _ _ _.

(*Id.*)  Third, Petitioner contends the confusion was compounded when the Court Crier asked whether the jury unanimously found any mitigating circumstances.  (*Id.* at 71.)

Respondents assert the *Mills* claim is procedurally defaulted because it was never raised on direct appeal nor in the PCRA petition and supporting memorandum. (Respondent's Brief, ECF No. 105 at 187-88.). Respondents note that the claims Petitioner raised on PCRA appeal were: (1) that the trial court erred by not *sua sponte* polling the jury to ask "whether each and every individual juror did or did not find a mitigating circumstance and whether that juror [weighed] the finding of such a mitigating circumstance against the aggravating circumstances presented;" and (2) trial counsel was ineffective for failing to poll the jury.[24] (*Id.* at 189, quoting Ex. BB, ECF No. 105-74 at 22-24.) In his habeas petition, Petitioner "folds in a series of separate Sixth Amendment ineffectiveness claims," associated with the *Mills* claim. (Respondents' Brief, ECF No. 105 at 187.)

Respondents further maintain that the *Mills* claim fails on its merits. On the jury verdict form, the jury swore "We the jury have found unanimously at least one aggravating circumstance and no mitigating circumstances." (*Id.* at 188, citing ECF No. 87-6, Appx. at 646.) Respondents assert the unanimous finding of no mitigating circumstances means the *Mills* claim fails pursuant to *Hackett v. Price*, 381 F.3d 281 (3d Cir. 2004). (*Id.*)

Petitioner's counsel stated on PCRA appeal, "In its Opinion the trial court focuses on the trial court instruction to the jury; this counsel has no complaint with the trial court's instruction[s] during the penalty phase, as they were proper." (*Id.* at 189.) Further, Respondents contend the jury instruction that was given closely mirrored the instruction that was approved by the Supreme Court in *Smith v. Spisak*, 130 S. Ct. 676 (2010). The jury instruction "only mentioned unanimity after first clarifying that it was not required in finding mitigating circumstances." (*Id.* at 192.)

---

[24] This separate claim is addressed in Ground Eleven *infra.*

In reply, Petitioner asserts his jury instruction claim should be considered in conjunction with his claim that counsel failed to present available mitigating evidence during the penalty phase of trial. (Reply, ECF No. 116 at 32.) When viewed in this light, Petitioner contends *Hackett v. Price* is not fatal to his claim. (*Id.*) He argues the jurors' signatures on the poorly worded verdict sheet does not indicate the jurors understood that they need not unanimously find mitigating circumstances. (*Id.* at 34.) Petitioner asserts his PCRA counsel's ineffectiveness in failing to raise trial counsel's failure to object to the faulty instruction provides cause to excuse his procedural default. (*Id.* at 33-34.)

Respondents are correct that Petitioner's habeas claim regarding the jury instruction, verdict form, and Court Crier's statement are factually and legally different from the claim he raised in state court. Thus, Ground Ten is unexhausted. *See McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999) ("To 'fairly present' a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted.")

Petitioner filed a timely direct appeal without raising this claim of trial court error, and the Pennsylvania Supreme Court denied his appeal on August 23, 1999. *RUSH I*, 646 A.2d 557 (Pa. 1994). To exhaust this claim, Petitioner would now be required to amend his direct appeal, which was decided eleven years prior to when he filed the present habeas petition. In *Lines*, the Third Circuit held "[w]e think it obvious that [the petitioner] could not successfully amend a [Petition for Allowance of Appeal to the Pennsylvania Supreme Court] that has now been denied for seven years and include within it claims that he could have included when he first filed the petition." 208 F.3d at 163-64 (citing *Caswell v. Ryan*, 953 F.2d 853 (3d Cir. 1992) (the Pennsylvania Supreme Court had never granted a request to file an appeal almost six years after the Superior

Court decision)).  This Court is confident that the Pennsylvania Supreme Court would not permit Petitioner to amend his direct appeal[25] to bring a claim that could have been timely raised more than a decade earlier.

Moreover, the one-year PCRA statute of limitations in Pa. C.S. § 9545(b) (1) would bar Petitioner from raising his claim in a second PCRA petition.  *See Whitney*, 280 F.3d at 250 (the petitioner, who did not raise his challenge to the trial court's instruction on intoxication at any level in the state courts, "must attempt to file yet another PCRA petition if he is now to assert his [new] claims in state court.")  The one-year statute of limitations for PCRA petitions is a jurisdictional rule that is strictly enforced, even in death penalty appeals.  *Id.* at 250.  Therefore, the jury instruction and related ineffective assistance of counsel claims are procedurally defaulted.

To establish cause to excuse procedural default of the ineffective assistance of trial counsel under *Martinez*, the petitioner must establish (1) PCRA counsel's failure "itself constituted ineffective assistance of counsel under *Strickland* and (2) the underlying ineffective assistance of trial counsel claim is "a substantial one,' which is to say, "the claim has some merit."  *Kelly v. Superintendent Grateford SCI*, 719 F. App'x 153, 159 (3d Cir. 2017) (quoting *Glenn v. Wynder*, 743 F.3d 402, 410 (3d Cir. 2014) (quoting *Martinez*, 566 U.S. at 14)).

---

[25] 210 Pa. Code 1941(a), (c) provides for automatic review of sufficiency of the evidence and propriety of the penalty by the Pennsylvania Supreme Court on direct review, a process that begins with the trial court clerk sending the record to the Supreme Court within twenty days after entry of a sentence of death, as if a notice of appeal had been filed.  "Any other issues from the proceedings that resulted in the sentence of death may be reviewed only if they have been preserved and if the defendant files a timely notice of appeal." § 1941(c).  The time for serving and filing briefs is governed by Pennsylvania Rules of Appellate Procedure, Rule 2185.  *Id.* § 9141(b)(4).  After docketing, the matter proceeds in the same manner as other appeals in the Supreme Court.  *Id.* § 1941(c). *See* Pennsylvania Rules of Appellate Procedure, Rules 1101-1123.  Rule 2139 of the Pennsylvania Rules of Appellate Procedure provides that "on appeal from the Superior Court or the Commonweatlh Court, appellants may prepare new briefs in the Supreme Court according to these rules …"

Where a jury instruction is "ambiguous and therefore subject to an erroneous interpretation," the proper inquiry is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380. The jury instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Boyde*, 494 U.S. 378 (quoting *Cupp v. Naughten*, 414 U.S. 141 (1973) (quoting *Boyd v. United States*, 271 U.S. 104, 107 (1926)).

In *Mills*, the jury found one statutory aggravating factor favoring the death penalty in the sentencing phase. 486 U.S. at 370. On the verdict form provided by the court, the jury marked "no" beside each mitigating circumstance and returned a sentence of death. *Id.* Mills argued that the capital punishment statute, as explained to the jury by the court's instructions and implemented by the verdict form, was unconstitutional in that it required imposition of the death penalty if the jury unanimously found an aggravating circumstance but could not agree unanimously as to any mitigating circumstances. *Id.* at 371. Mills believed the jury had been instructed that even if some jurors believed some mitigating circumstance was present, unless they could unanimously agree on the existence of the same mitigating factor, the mandatory sentence was death. *Id.*

"Under Maryland's sentencing scheme, if the sentencer finds that any mitigating circumstance or circumstances have been proved to exist, it then proceeds to decide whether those mitigating circumstances outweigh the aggravating circumstances and sentences the defendant accordingly." *Id.* at 375. "[I]f the jury understood that it should mark "no" [on the verdict form] when it failed to agree unanimously that a mitigating circumstance existed, then some jurors were prevented from considering 'factors which may call for a less severe penalty,' *Lockett v. Ohio*, 438 U.S. [586,] 605, 98 S.Ct. [2954,] 2965 [(1978)], and petitioner's sentence cannot stand." *Id.* at 376.

The *Mills* Court concluded that although it could not determine how the jury interpreted the instructions, "common sense and what little extrinsic evidence we possess suggest that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation . . . unless they are instructed to do so." *Id.* at 383. Thus, the death penalty could not be affirmed where there was "a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.* at 384.

In *McKoy v. North Carolina*, 494 U.S. 433, 439-40 (1990), the Supreme Court clarified that "[o]ur decision in *Mills* was not limited to cases in which the jury is required to impose the death penalty if it finds that aggravating circumstances outweigh mitigating circumstances or that no mitigating circumstances exist at all." Instead, it held that the death penalty could not be imposed "where 1 juror was able to prevent the other 11 from giving effect to mitigating evidence." *Id.* at 440 (quoting *Mills*, 486 U.S. at 374.) On the same day it issued *McKoy*, the Supreme Court held in *Boyde* "that the proper inquiry for reviewing a jury instruction that is ambiguous and therefore subject to erroneous interpretation "is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Hackett v. Price*, 381 F.3d 281, 290 (3d Cir. 2004) (quoting *Boyde*, 494 U.S. at 380).

In *Hackett*, the Third Circuit began its death penalty jury instruction analysis by setting out the trial court's jury instructions. 381 F.3d at 271. The jury instructions included the following:

> Remember again that your verdict must be unanimous. All twelve of you must agree. Please note, it therefore cannot be reached by a

> majority vote or by a percentage. It must be the verdict of each and
> every one of you.
>
> Remember that your verdict must be a sentence of death if you
> unanimously find at least one aggravating circumstance and no
> mitigating circumstance, or if you unanimously find one or more
> aggravating circumstances which outweigh any mitigating
> circumstances. In all other cases, your verdict must be a sentence of
> life imprisonment.
>
> You will be given a verdict slip, which you will refer to, ... upon
> which to record your verdict and findings. You will follow the
> directions on the verdict slip and do whatever is required.

*Id.*

On the verdict form, which began with the phrase, "[w]e, the jury, empaneled in the above

entitled case, having heretofore determined that the defendant . . . is guilty of murder of the first

degree, do hereby find" there were three sentences checked under the heading of "Aggravating

Circumstances"; and none of the eight sentences were checked under the heading "Mitigating

Circumstance(s)." *Id.* at 298-99. Under the heading, "We, the jury, have found unanimously," the

following sentence was checked, "at least one aggravating circumstances and no mitigating

circumstance. The aggravating circumstance(s) [] (are) #2 and #7." *Hackett*, 381 F.3d at 298-99.

The *Hackett* Court recognized that, where the jury found at least some mitigating evidence,

a court could not know "the precise extent to which the jurors properly considered the evidence of

mitigating circumstances when weighing that evidence against the aggravating circumstances." *Id.*

at 301. But where the verdict form indicated "the jury 'found unanimously at least one aggravating

circumstance and no mitigating circumstances'" there was no "*Mills/Boyde* violation" because "no

juror found that there was any mitigating circumstance." *Id.* (emphasis in original). The court

reasoned:

> This result is logically unavoidable. When the jury found
> unanimously that there was no mitigating circumstance, it left no

room to speculate that perhaps one juror was confused about
unanimity requirements and therefore precluded from considering
mitigating evidence. After all, if even a single juror thought that
there was any mitigating circumstance, then that juror could not join
a verdict in which the jury "found unanimously" that there was "no
mitigating circumstance."

*Id.*

Here, the jury instructions accurately stated, "You need not be unanimous in deciding a
mitigating circumstances (sic) had been proved." (Respondents' Brief, Ex. N, ECF No. 105-59 at
68.)  The next sentence of the jury instruction was not as clear, "If one or more of you find one or
more mitigating factors have been proven, you may individually consider such a factor or factors
in reaching a unanimous decision." (*Id.*)  However, any possibility that the jury was confused, as
in *Hackett*, was dispelled by the verdict form where the jury checked the sentence: "We the jury
have found unanimously at least one aggravating circumstance and no mitigating circumstance.
The aggravating circumstance(s) (is) (are) 1 & 2." (Petr's Mem., ECF No. 87-1 at 646.)  Therefore,
neither trial nor PCRA counsel were ineffective for failing to raise a *Mills* claim challenging the
jury instructions in this matter.  Further, appellate counsel made a reasonable strategic decision in
raising only the issue that the Court Crier's ambiguous question to the jury should have caused
counsel to poll the jury.   Therefore, Ground Ten of the habeas petition is dismissed because
Petitioner has not established cause and prejudice to excuse procedural default of this claim.

F.    Claims Waived on PCRA Remand:  Grounds One, Nine and Eleven

Petitioner asserts he raised Grounds One, Nine and Eleven in post-conviction proceedings.
(Petr's Mem., ECF No. 86 at 27, 66, 74.)  The Pennsylvania Supreme Court issued a limited
remand on these claims because the PCRA court failed to give Petitioner specific pre-dismissal
notice and opportunity to amend upon denying Petitioner an evidentiary hearing.  (*Id.* at 28 (citing
*Rush*, 838 A.2d 651 (Pa. 2003)).

Petitioner sought to represent himself on PCRA remand. (*Id.*) The court held a final hearing on his request to proceed *pro se* on August 30, 2007. (*Id.*) At the hearing, Petitioner stated that he intended to waive the remanded claims and ask the Pennsylvania Supreme Court to relinquish jurisdiction and permit him to start his PCRA proceedings anew. (*Id.*) The PCRA court permitted Petitioner to do so. (*Id.*) In May 2007, the PCRA court dismissed Petitioner's *pro se* amended PCRA petition. (*Id.*)

Petitioner contends it is clear he did not understand the appellate process. (*Id.* at 28-29.) Nonetheless, the PCRA court allowed him to waive these claims and amend the petition, despite the Pennsylvania Supreme Court's warning that it would not consider additional claims. (*Id.* at 29.) Petitioner argues that he did not make a knowing, intelligent and voluntary decision to waive his right to counsel and dismiss the remanded claims. (*Id.*)

Respondents contend Grounds One, Nine and Eleven are unexhausted and procedurally defaulted because Petitioner raised the claims in his PCRA appeal to the Pennsylvania Supreme Court, but when the court remanded the claims, Petitioner knowingly, intelligently and voluntarily waived the claims. (Respondent's Brief, ECF No. 105 at 100.) The state court's competency finding is entitled to a presumption of correctness that Respondents assert has not been rebutted by clear and convincing evidence. (*Id.* at 100-01.)

Respondents argue that a litigant's technical legal knowledge is not relevant to his competency to waive counsel. (*Id.* at 101.) There is no evidence that Petitioner is suffering "a mental disease, disorder, or defect that may substantially affect his capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation." (*Id.* at 102 (citing *Rees v. Peyton*, 384 U.S. 312, 314 (1966)). Respondents contend Petitioner's pleadings and correspondence are lucid, consistent, and reality-based. (*Id.* at 104.) For example,

there are inaccuracies in the notes of testimony, which Petitioner contends were altered by the judge, prosecutor, his defense counsel and the stenographer. (*Id.*) Respondents reject Petitioner's contention that his references to a broad conspiracy to alter the trial transcripts is delusional. (*Id.*) Respondents contend that Petitioner made a rational decision to represent himself and waive the PCRA remanded claims, and there is no cause and prejudice to excuse procedural default of these claims. (*Id.* at 105.)

In reply, Petitioner argues an evidentiary hearing is appropriate to present facts to rebut any state court findings of fact that are entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(2). (Petr's Reply, ECF No. 116 at 13.) He maintains that if his initial PCRA counsel had properly pled his claims for relief, he should have been granted an evidentiary hearing in PCRA proceedings. (*Id.*) Any lack of diligence in developing the record should be attributed to PCRA counsel's ineffectiveness rather than on the actions of his mentally impaired client. (*Id.*)

Petitioner asserts this Court is free to consider new evidence to rebut presumptively correct state court findings of fact by clear and convincing evidence under 28 U.S.C. § 2254(e)(2). (*Id.* at 14 n.5.) Petitioner contends that PCRA counsel's failure to properly raise and plead Ground Nine constitutes cause and prejudice to excuse procedural default pursuant to *Martinez v. Ryan*. (*Id.* at 31.) Petitioner also claims he did not make a knowing, intelligent and voluntary waiver of PCRA counsel on remand. (*Id.*) Petitioner seeks an evidentiary hearing to support his proffer regarding mitigation evidence that trial counsel should have presented and contends that he can establish entitlement to relief on this claim. (*Id.*)

In Sur-reply, Respondents assert the only evidence of Petitioner's mental status in the record is a state-court determination finding him competent. (Respondents' Sur-reply, ECF No. 120 at 5.) Respondents argue that Petitioner has not sustained his burden to obtain an evidentiary

hearing under 28 U.S.C. § 2254(e)(2) because he was not diligent in developing the factual basis for Ground Nine in state court. (*Id.* at 7.) Even if he could meet the diligence standard, Respondents contend he could not make the showing that if the facts had been known, no reasonable fact-finder would have found him guilty. (*Id.*) In summary, Respondents argue (1) Petitioner was not diligent; (2) *Martinez* is inapplicable to the claim; and (3) mental impairment does not justify a hearing because there is a state court finding of competence that must be presumed correct. (*Id.*)

Respondents also cite to *Cullen v. Pinholster*, where the U.S. Supreme Court held that new evidence introduced at a federal evidentiary hearing in support of a claim that was previously adjudicated on the merits in state court is irrelevant to § 2254(d)(1) review. (Respondents' Brief, ECF No. 105 at 8 (citing *Pinholster*, 131 S. Ct. 1388 (2011)).[26] Further, Respondents contend *Pinholster* requires a district court to perform an analysis under § 2254(e)(2) before granting an evidentiary hearing on a constitutional claim on habeas review. (*Id.* at 9.) Respondents assert there are two reasons no PCRA hearing was held in state court: (1) PCRA counsel's proffer was insufficient; and (2) Petitioner waived the claims that were remanded for a hearing.

The first issue the Court must decide is whether Grounds One, Nine, and Eleven are procedurally defaulted. The Pennsylvania Supreme Court remanded these claims for further PCRA court proceedings, but Petitioner, representing himself, withdrew the remanded claims and sought to raise new claims. The claims are procedurally defaulted because Petitioner waived appellate review by not raising the claims in his amended PCRA petition in the remand proceedings. *See Com. v. Lambert*, 797 A.2d 232, 240-41 (Pa. 2001) (finding claims that were not

---

[26] Section 2254(d)(1) review is not relevant to Grounds One, Nine or Eleven because the Pennsylvania Supreme Court remanded the claims for further review.

raised in PCRA petition were waived under Pa.R.A.P. 302(a) "Issues not raised before the lower court are waived and cannot be raised for the first time on appeal.") Additionally, Petitioner cannot raise the claims in a new PCRA petition because he is time-barred under the one-year time limitation in 42 Pa. C.S. § 9545(b)(1).

"Cause for a procedural default exists where 'something external to the petitioner, something that cannot fairly be attributed to him[,] ... impeded [his] efforts to comply with the State's procedural rule.'" *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (quoting *Coleman*, 501 U.S., at 753, 111 S.Ct. 2546 (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L.Ed.2d 397 (1986); emphasis in original).

Petitioner asserts two bases for this Court to find cause and prejudice to excuse his procedural default of Grounds One, Nine and Eleven. First, he claims cause and prejudice under *Martinez* because his PCRA counsel failed to properly support his PCRA petition, leading to the remand by the Pennsylvania Supreme Court. Second, he asserts he was not competent to represent himself on PCRA remand and did not knowingly, voluntarily and intelligently waive his right to counsel. In either instance, the resulting prejudice is that he was unable to further develop the three remanded claims before the PCRA court. Petitioner contends that if he had been permitted to present mitigation evidence, which his trial counsel failed to investigate and present at sentencing, he could have established prejudice from trial counsel's failure because the mitigation evidence would likely have convinced at least one juror that the mitigating factors outweighed the aggravating circumstances at sentencing.

Although PCRA counsel failed to adequately brief these claims in the PCRA petition, the Pennsylvania Supreme Court remanded the claims to permit Petitioner to amend his PCRA

petition. *RUSH II*, 838 A.2d at 661. Therefore, it was Petitioner's waiver of the remanded claims that prevented the claims from being heard.

Petitioner must establish both cause and prejudice. First, the Court finds he has established prejudice on Ground Nine. The Pennsylvania Supreme Court rejected the PCRA court's conclusion that it was self-evident if the jury had to weigh aggravating and mitigating factors, the outcome would have been the same, a death sentence. *RUSH II*, 846 A.2d at 661. Indeed, the result of the initial PCRA proceedings would likely have been different, thus meeting *Strickland's* prejudice standard, if Petitioner had been allowed to present the mitigation evidence proffered here, the violence he suffered from early childhood and its effect on his development and mental health, a family history of mental illness, dropping out of school in sixth grade, and significant substance abuse beginning at age nine. *See Thomas*, 570 at 129 (finding a reasonable probability that effective counsel would have chosen to present evidence of the petitioner's mental health history, and that its presentation would have convinced at least one juror to sentence the petitioner to life imprisonment despite his horrific actions). As the Pennsylvania Supreme Court noted, only one juror had to find in favor of mitigation for a life sentence to be imposed rather than the death penalty.

The Court must also determine whether the PCRA court erred in finding Petitioner competent to represent himself on PCRA remand and permitting him to waive the remanded claims. "'[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Coleman*, 501 U.S. 722, 753 (1991) (quoting *Murray*, 477 U.S. at 488). Petitioner's PCRA counsel on remand sought to proceed on the three claims

remanded by the Pennsylvania Supreme Court but was prevented from doing so when the PCRA court permitted Petitioner to represent himself and waive those claims.

28 U.S.C. § 2254(e)(1) states, "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Petitioner must rebut by clear and convincing evidence the state court's finding that he was competent to represent himself on PCRA remand. *See Nara v. Frank*, 488 F.3d. 187, 200-01 (3d Cir. 2007) (state court finding of defendant's mental incompetence entitled to a presumption of correctness).

Upon remand, the PCRA court ordered a mental health evaluation by Dr. James G. Jones to determine Petitioner's competency. (Pet., ECF No. 1-1, Appx. 1 at 50.) Apparently misunderstanding the procedural posture of the case, Dr. Jones performed the evaluation and found Petitioner incompetent to "represent himself during the sentencing phase of his trial." (Pet., ECF No. 1-1, Appx I at 49-51.) Dr. Jones stated, in pertinent part:

MENTAL STATUS EXAMINATION:

Mr. Rush was calm and cooperative with this evaluation. He was able to maintain appropriate eye contact throughout this evaluation. He was awake, alert, and oriented to person, place and time. His mood was anxious and his affect was constricted. His speech was goal-directed. He denies auditory or visual hallucinations. He denies suicidal or homicidal ideations. His long-term and short-term memories were intact. His insight and judgment are poor. He told me he believes that he has been incarcerated for 16 years and placed on death row without ever going to court. He told me that he has appealed his case through the Federal and Supreme Courts. When I then asked if he has appealed his case, doesn't that mean that he has already been to court and been found guilty of a charge? He still contends that he has never gone to court and that he has never spoken to a lawyer and again that he has been incarcerated for 16 years and has been placed on death row.

COMPETENCY EVALUATION

Although Mr. Rush initially presents well, he does not seem to have a clear understanding of the events that have transpired thus far. He appears to be somewhat delusional and is thus not competent to represent himself in a court of law. He appears to be somewhat grandiose.

PSYCHIATRIC ASSESSMENT

Mr. Rush has a diagnosis of Bipolar Affective Disorder.

RECOMMENDATIONS

Mr. Rush would benefit from a period of inpatient psychiatric treatment within the Philadelphia prison system's psychiatric unit. This treatment can be given by way of a 304 petition via 405 for a period of up to sixty days.

(*Id.*)

On April 21, 2005, the PCRA court ordered Dr. Jones to reevaluate Petitioner. (Respondents' Brief, Ex. FF, ECF No. 105-79.) The court order directed that after the reevaluation, the case would be listed for Dr. Jones to testify and explain his findings. (*Id.* at 1.) The evidentiary hearing never occurred.

Dr. Jones evaluated Petitioner on June 30, 2005. (Pet., Appx. 1 at 52-53.) He first inquired about Petitioner's mental health history, and Petitioner admitted to treatment at the Child Guidance Center at age twelve, based on behavioral problems. (*Id.* at 53.) Petitioner also admitted to alcohol and Valium use prior to 1979. (*Id.*) On mental status examination, Petitioner was anxious but otherwise intact, and his insight and judgment were fair. (*Id.*) Petitioner was able to discuss the charges against him, he understood the roles of the judge, jury, district attorney and witnesses, and he accepted responsibility for being held to the same standard as an attorney by representing himself. (*Id.*) In addition to his interview with Petitioner, Dr. Jones reviewed Petitioner's November 23, 2004 colloquy and Petitioner's *pro se* PCRA remand petition. (*Id.* at 52.)

Dr. Jones concluded that Petitioner was competent to represent himself on PCRA remand. (*Id*. at 53.)  He explained the change in his opinion from his last evaluation:

> During my first evaluation conducted on November 23, 2004, I had not had access to the testimony or the colloquy of defendant Larry Rush and his request to represent himself.  I also did not have the opportunity to review the petition that he had prepared.  Without that information, his statements to me seem to be somewhat delusional.  However, they have been born in fact.  Given that[,] I wish to withdraw the mental diagnosis that I had given him which was Bipolar Affective Disorder.

(*Id*.)

In May 2007, the PCRA court relied on Dr. Jones' written report in finding that Petitioner was competent to represent himself in the PCRA remand proceedings.  (Pet., ECF No. 1-1, Appx. at 45-46.)  The court permitted Petitioner to waive the three remanded claims, knowing from the hearings it had conducted that the Pennsylvania Supreme Court expressly limited the remand to those claims, warning that the remand was not a "carte blanche" invitation to bring new claims. (*Id*. at 46.)  On October 12, 2007, the Pennsylvania Supreme Court declined Petitioner's request to relinquish jurisdiction to permit him to bring new PCRA claims.  *RUSH III*, 934 A.3d 1151 (Pa. 2007) (per curiam).

For the reasons discussed below, the record does not support Dr. Jones' opinion of competence.  Instead, the record supports Dr. Jones' 2004 opinion that Petitioner was incompetent based on his delusional thinking.

[T]he competency standard for waiving the right to present mitigation evidence mirrors the standard for competency to stand trial and to waive the right to counsel…" *Com. v. Blakeney*, 108 A.3d 739, 757-58 (Pa. 2014) (citing *Com. v. Puksar*, 951 A.2d 240, 288–89 (Pa. 2008).

> In Pennsylvania, that standard is generally understood to be whether the defendant has the ability to consult with counsel with a reasonable degree of understanding and whether the defendant has a rational understanding of the nature of the proceedings.

> *Commonwealth v. Appel*, 547 Pa. 171, 689 A.2d 891, 899 (1997). In
> other words, a defendant will be deemed competent when he in fact
> understands both the significance and consequences of the waiver
> decision. *Starr*, 664 A.2d at 1336. Finally, in considering
> competency, the court must keep in mind that "the focus of a
> competency inquiry is the defendant's mental capacity; the question
> is whether he has the ability to understand the proceedings." *Starr*,
> 664 A.2d at 1339 (quoting *Godinez, supra* ).

*Puksar*, 951 A.2d at 288-89.

It appears that Dr. Jones earlier opinion of Petitioner's incompetence was based on Dr. Jones' own misunderstanding of the procedural posture of the case; i.e. that Petitioner was not claiming he never went to trial on the charges but that he had not seen a lawyer in sixteen years after he was convicted and sentenced to death. In that sense, Petitioner's claims that he had not seen a lawyer in sixteen years were born in fact. But what Dr. Jones failed to discuss, despite stating he reviewed Petitioner's *pro se* PCRA remand petition, was that for those sixteen years in which Petitioner had not seen a lawyer he was pursuing a *pro se* claim that there was a conspiracy between the judge, prosecutor, his own attorneys and the stenographer to alter the trial transcript to prevent him from receiving a fair appeal of his conviction and sentence.

Soon after his conviction and sentence, Petitioner began to seek review of his *pro se* claim that 90% of the trial transcript in his case was altered by his trial judge, his trial counsel, the prosecutor, and the stenographer. In fact, Petitioner claimed that his trial transcript was altered in all three criminal cases in which he convicted at that time. In a letter dated March 28, 1991, Petitioner wrote:

> Sir, I have been denied my right to a fair trial, not once or twice, but
> three times, and the same people (Hon. James D. McCrudden,
> Charles J. Cunningham III, Esq., Richard L. Brown, Esq.; and
> Hilary Connor, A.D.A) who denied me my right to a fair trial is also
> denying me my right to an adequate and fair review by your
> respectful court.
> …

On 5-13, 1987, I was arrested for a stabbing of a lady on 80th and Germantown Ave. On 5-14, 1987, I was charged with the stabbing and killing of my cousin, and in July of 1987, I was charged with the robbery of two (2) young girls at knife point.

The three (3) cases have the same thing in common, i.e., they were all committed with a knife, just the way Detective Morton wanted it. Nevertheless, he needed help to make them stick, and he got it and is still getting it.

Petitioner explained that he was forced to go to trial in the first two instances without ever having conferred with his counsel, Charles J. Cunningham, III. He was permitted to obtain his own counsel for the murder trial of his cousin. Petitioner complained that post-trial briefs had been filed on his behalf in all cases without his knowledge or any consultation with an attorney. He wrote:

I now will like for you, and everyone that will be reading this letter, to know that everything that is being said in the brief, and all other briefs that has been filed in my name is −are− not based on true facts, and I ask that you stop all decisions on my cases until I can find me a lawyer that will help me prove to you and the world that 90% of all my notes of testimonies has been changed by Hon. James D. McCrudden; Richard L. Brown, Esq.; Charles J. Cunningham III, Esq., and the stenographer.
…
P.S. Proving my innocence will not only reveal that I was framed but will also reveal that the killer of Veronica Hands (victim) is also the killer of Linda James (aunt who found victim, and was killed while I waiting for trial) and Nellie James (mother of Linda James and grandmother of Veronica Hands, who was killed after trial).

(Respondents' Brief, Ex. T, ECF No. 105-66 at 10-14.)

It is true, as demonstrated by Respondents, that there were many typographical and spelling errors in the trial transcript by the stenographer. Respondents admit that only one of the transcript errors was substantive and it was corrected by the trial court. (Respondent's Brief, Ex. R, ECF No. 105-64 at 1.) Petitioner acknowledged this in his *pro se* PCRA remand petition, stating, "On

June 27, 1990,[27] a hearing was held before the late Hon. James D. McCrudden; specially on a single issue to determine whether or not Petitioner was arraigned on two (2) murders instead of one (1). At said hearing, Petitioner was represented by Louis T. Savino, Jr., Esq. (newly appointed counsel whom Petitioner became aware of for the first time.)" (Respondents' Brief, Ex. EE part 1, ECF No. 105-77 at 6-7.)

In the *pro se* petition that Dr. Jones reviewed as part of his reevaluation of Petitioner, Petitioner alleged he was deprived of his constitutional rights because his trial transcript was deliberately altered. (Respondents' Brief, Ex. EE part 1, ECF No. 105-77, ¶11.) Petitioner explained:

> In April, 1991 Petitioner submitted an informal letter (dated March 28, 1991) to the Supreme Court of Pennsylvania.
>
> In said letter, Petitioner alleged that he was denied a fair trial on three different occasions (Nos. 2272-2285, July Term, 1987; Nos. 1176-1178, July Term, 1987. and 0871-0875, July Term, 1987 -- the above captioned matter), and that he was being denied his right to an adequate and fair review, that 90% of all his notes of testimonies have been changed. See copies of said letter and Assistant District Attorney response annexed hereto as Exhibit "A" and "B", respectfully.

(*Id.* at 7, ¶¶14-15.) Petitioner further stated that when Michael Floyd was appointed to represent him in his PCRA proceedings, he told Floyd that 90% of his notes of testimony had been deliberately altered, but Floyd used the altered transcript to file a brief on his behalf. (*Id.* at 9.) Floyd called this transcript claim "asinine" and refused to present it. (*Id.*, ¶26.) Petitioner filed a

---

[27] The hearing was held on June 27, 1991 with Petitioner present, and the correction was made that Petitioner was arraigned on the burglary charge. (Pet., Appx. I at 19.) Petitioner had, however, initially been charged with two counts of murder for killing Veranica Hands and her unborn child. (Respondents' Brief, Ex. B, ECF No. 105-2.) The charge of homicide of the fetus was discharged at a preliminary hearing on July 3, 1987. (*Id.* at 37.)

civil rights complaint against Floyd for refusing to bring this claim, and the complaint was dismissed as frivolous. (*Id.*, ¶31.)

Dr. Jones also stated that he reviewed Petitioner's colloquy on November 23, 2004, where Petitioner waived his right to counsel on PCRA remand. Petitioner was represented by counsel at this hearing. (Respondents' Brief, Ex. DD, ECF No. 105-76.) As the court was reviewing the remand instructions from the Pennsylvania Supreme Court, which limited the remand to three specific issues, Petitioner interrupted his counsel and said that the Pennsylvania Supreme Court remand decision was irrelevant. (*Id.* at 3-4.) Petitioner stated,

> everything that was appealed by my case by every lawyer was misleading. The only way the Court is going to be – have an understanding of the history of my case if I become my own attorney. I do not wish to have no lawyer at this time and no other time, not even a stand-by. … I know what I have to do. The first thing that have to be done is that the Supreme Court have to be made aware of the fact that I'm my own lawyer so they can relinquish jurisdiction so I will be able to submit to this Court a supplement so this Court can fully understand the history of my case that was never place in front of no courts since I've been on death row…Court: are you going to present anything concerning mental health… Rush "No, sir."

The PCRA never conducted an evidentiary hearing at which Dr. Jones could have explained his finding of competence, despite Petitioner's insistence that there was a conspiracy to alter his trial transcripts to prevent him from showing on appeal that he had been framed.[28] Not surprisingly, on August 16, 2007, the Commonwealth filed a "Motion for Appointment of Counsel

---

[28] Also, in Petitioner's *pro se* PCRA remand petition, Petitioner attached a copy of his July 27, 1997 letter to Attorney Rudenstein, wherein he explained his conspiracy theory that he was framed including that "the most damaging evidence against me was the fingerprints, but if I'm not the killer there's no way my fingerprints could have been in that apartment." (Respondents' Brief, Ex. EE part 2, ECF No. 105-78 at 62.)

and Remand" in the Pennsylvania Supreme Court and asked the court to remand to the Court of

Common Pleas because:

> [a]lthough the defendant has exercised his right to represent himself and is currently proceeding pro se, the record indicates that, at some point, defendant may arguably have not been competent to waive his right to counsel. The lower court commendably sought to make certain that the defendant was competent, but no testimony was presented on this issue.

(ECF No. 86 at 13, quoting App. at 62.)

Petitioner has rebutted by clear and convincing evidence the state court's finding, based on

Dr. Jones' 2005 opinion, that Petitioner was competent to represent himself on PCRA remand.

The long record of Petitioner's belief in a grand conspiracy to frame him and prevent him from

appealing by altering 90% of the trial transcript strongly suggests he did not understand the

proceedings or the consequences of waiving his mitigation claim in favor of his conspiracy claim.

But for this erroneous finding, Petitioner would not have waived the three claims remanded to the

PCRA court by the Pennsylvania Supreme Court.  Petitioner was prejudiced by his inability to

submit materials, which he has proffered here, in support of his claim that trial counsel provided

ineffective assistance by failing to develop and present school, work and mental health records as

mitigation evidence at sentencing.

> **Ground Nine:**  <u>Counsel was ineffective in failing to investigate, develop, and present available background and mitigation evidence relevant to the penalty phase in violation of the Sixth, Eighth and Fourteenth Amendments.</u>

Before Petitioner can proceed on Ground Nine of his petition, he must overcome the hurdle

that the mitigation evidence he now proffers is not in the state court record.  Thus, Petitioner seeks

an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2) to further develop the factual basis for

Ground Nine.  In Ground Nine, Petitioner asserts his trial counsel failed to investigate, develop

and present all reasonably available mitigation evidence regarding his life's history.  (Petr's Mem.,

ECF No. 86 at 56.)  Petitioner proffers that if his trial counsel had conducted a reasonable investigation and presented available mitigating evidence the jury would have heard the following:

> Petitioner grew up in extreme poverty in a violent area of Philadelphia fraught with violence, drugs, gangs and gambling. Walls and buildings in the community were riddled with bullet holes.  Gun shots rang out daily because of gang activity.
>
> His family lived in a run-down apartment in the Tasker Homes Projects, often without the basic amenities; i.e., food, clothing.
>
> Petitioner's father died when he was six years old, his body recovered under a pile of snow.  This event had a traumatic impact on his life.  After Petitioner's father passed away he became more withdrawn.  He began exhibiting a host of behavioral problems. Petitioner had a very difficult relationship with his mother.
>
> Petitioner's mother, Dorothy Rush, ran a speakeasy from their home.  There would be a lot of people drinking in the house at all hours of the night.
>
> Petitioner and siblings were made to clean the house at all hours of the day including well into the night. The children had to clean even during Dorothy's many parties.  Even if they had gone to bed, Dorothy would wake them to clean after a party.
>
> Petitioner experienced significant physical abuse starting at a very young age.  When Petitioner was about five he was severely beaten by his Grandfather Butch.
>
> Petitioner also suffered traumatic physical abuse at the hands of his mother, Dorothy.   Dorothy Rush would tie Petitioner's hand together and beat him with ropes, switches, and electrical cords. Once Dorothy Rush hit Petitioner and his sister Kathy Rush, with the leg of a table.  These beatings would last up to an hour.
> Dorothy Rush fired a gun at Petitioner and his sister Kathy barely missing them.  Dorothy Rush, in Petitioner's presence, choked his sister Kathy until she lost consciousness.  When Kathy Rush regained consciousness, Dorothy Rush stated "you ain't dead yet?" and continued to beat her even more.
>
> The physical abuse also included humiliation, such as pulling pants down and lying down for the beating.

Dorothy Rush had many different boyfriends, some of whom were physically abusive to Petitioner. One of her boyfriends, Leroy, beat Petitioner with an extension cord leaving imprints of the electrical wire all over his body. This beating was prolonged and horrifying.

Dorothy was verbally abusive to Petitioner and his sister. If the children didn't do what they were told, she would tell them she, "would kill their ass." Dorothy would call Petitioner "a black son of a bitch."

Petitioner would run away from home as a result of his mother's physical abuse of him or his sister, Kathy.

Petitioner was taken to see a psychiatrist at the Child Guidance Center when he was nine years old.

Dorothy Rush's sister, Margaret Thomas, took her to court because of the physical abuse. DHS removed Petitioner and his sister [and] awarded custody to Ms. Thomas.

Petitioner and his siblings had a difficult time in school. Petitioner was often truant. His grades were poor, consisting mainly of Cs, Ds and Es. Petitioner dropped out of school in the sixth grade.

Several of Petitioner's family members were involved in the drug trade.

Petitioner started using drugs at the age of nine. He was addicted to drugs by his early teens.

Petitioner started drinking at age 12 and would consume a pint of vodka on a daily basis and would suffer blackouts. In 1979, Petitioner ingested forty (40) Valium pills after consuming alcohol.

Several of Petitioner's family members, including Dorothy Rush, were diagnosed with schizophrenia, paranoid type. Dorothy was often under heavy medication for her mental illness.

Because of Dorothy Rush's poor physical and mental health Petitioner had move[d] from one family member's house to another including living with relatives residing in South Carolina.

Petitioner has long-standing mental health deficiencies including organic brain dysfunction, delusions, and related psychotic symptoms, depressions and other trauma-related syndromes.

(Petr's Mem., ECF No. 86 at 61-62.)

28 U.S.C. § 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--(A) the claim relies on--(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). If an evidentiary hearing supports Petitioner's proffer, it is likely one juror would find Petitioner's background of severe child abuse beginning at an early age and lasting many years, his sixth grade education, family history of mental illness, his own mental health history, including substance abuse at an early age, outweighed the aggravating factors and entitle him to a sentence of life imprisonment rather than the death sentence. *See Abdul-Salaam v. Sec. of Pa. Dep't of Corr.*, --F.3d--, 2018 WL 3384712 (3d Cir. July 12, 2018) (prejudice prong of *Strickland* met on death penalty phase claim of ineffective assistance of counsel claim where counsel presented three witnesses to generally show the petitioner grew up in an abusive home but evidence elicited from additional family members at PCRA hearing "gave a much more detailed image of the home in which [the petitioner] was raised and highlighted the regularity with which [the petitioner] faced severe mental and physical abuse," testimony which was supported by school and juvenile records that could have been presented to buttress the mitigation factor.)

Before Petitioner is entitled to an evidentiary hearing under § 2254(e)(1), he must also show that his failure to develop the factual basis of his claim in the state courts was not attributable his or his counsel's lack of diligence. *Williams v. Taylor*, 529 U.S. 420, 432 (2000). Diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court…." *Id.* at 435. Petitioner's initial PCRA counsel sought to develop the factual basis of Petitioner's ineffective assistance of counsel claim for failure to investigate and develop background mitigation evidence for the sentencing phase. It was the PCRA court's error in finding Petitioner competent to represent himself on PCRA remand, and permitting him to withdraw the remanded PCRA claims, that prevented him from developing the factual basis for this claim in state court. Therefore, 28 U.S.C. § 2254(e)(2) permits an evidentiary hearing to develop a factual basis for Ground Nine.

The Court will reserve decision on Ground Nine pending an evidentiary hearing. However, because Petitioner has not shown prejudice from procedural default on Grounds One and Eleven of his petition, as discussed below, the evidentiary hearing will be limited to the factual basis for Ground Nine.[29]

> **Ground One:** Counsel was ineffective in failing to properly investigate, and present evidence establishing that the Commonwealth's prime witness Jerry McEachin had a motive to fabricate his testimony.

---

[29] Petitioner's argument that an evidentiary hearing is appropriate to present facts to rebut any state court findings of fact, or in support of cause and prejudice to excuse procedural default pursuant to 28 U.S.C. § 2254(e)(2) is incorrect. An evidentiary hearing under § 2254(e)(2) is permissible only after Petitioner establishes that "(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(A)(ii) and (B). Only in Ground Nine has Petitioner established that but for constitutional error no reasonable fact-finder would have found him guilty of the underlying offense (or in the case of Ground Nine, found for the death penalty).

In support of this claim, Petitioner asserts that McEachin was the State's prime witness and his counsel failed to cross-examine McEachin on his interest in cooperating with the police. (Petr's Mem., ECF No. 86 at 25.)  Petitioner posits that his counsel could have established McEachin's possible complicity in the murder, given that he went with Petitioner to sell jewelry stolen from the victim's apartment, and that he cooperated because he knew he could be charged with murder or as an accomplice, facing life in prison or the death penalty.  (*Id.*)  Petitioner admits his counsel raised these issues in closing argument but contends the argument would have been much more powerful had counsel cross-examined McEachin.  (*Id.* at 26-27.)

Respondent contends cross-examination on whether McEachin was being prosecuted for the comparatively minor crimes he could have been charged with in this case, possessing cocaine, selling the victim's jewelry, and using her MAC card, would have added little to the defense. (Respondents' Brief, ECF No. 105 at 105.)  McEachin could not have been charged as a principal or an accomplice under the circumstances present.  (*Id.* at 105-06.)  Even if counsel was deficient in not cross-examining on this topic, Respondent argues there was no prejudice because McEachin's testimony was corroborated by physical evidence including the victim's husband identifying jewelry that was stolen and recovered, Petitioner's bloody fingerprint at the murder scene and his fingerprints on the carafes.  (*Id.* at 106.)  Furthermore, trial counsel made this argument to the jury in closing based on inferences the jury could draw from the evidence, although he did not cross-examine McEachin on the issue.  (*Id.* at 107.)  Finally, the trial judge gave the following instruction:

> Now, there was a Jerry McEachin who testified, and as I recall his testimony, he testified that he and the Defendant went to various other places and attempted to dispose of property which was stolen property. Experience has shown if one is involved in the commission of a crime but apprehended, [he] may falsely blame another of the corrupt or wicked motive.

> On the other hand, such a person may tell the truth about the role of himself and the other in the commission of the crime. In deciding whether to believe Jerry McEachin you should be guided by the following principles that apply especially to his testimony.
>
> The testimony of Jerry McEachin as an accomplice should be looked upon with disfavor because it comes from a corrupt and polluted source.
>
> Second, you should examine his testimony carefully and accept it only with caution and care.
>
> Third, you should consider whether or not his testimony is supported in whole or in part for if that testimony is supported by independent sources, it becomes more commendable.

(ECF No. 105 at 107-08 (Respondents' Brief, Exhibit L, ECF No. 105-57)).

In reply, Petitioner contends his counsel's failure to cross-examine McEachin on whether the State threatened to prosecute him for a crime if he did not testify deprived the jury of the opportunity to assess his credibility. (Petr's Reply Brief, ECF No. 116 at 15-16.)

This Court finds, assuming trial counsel did not have a strategic reason for not cross-examining Jerry McEachin on whether the State threatened him with prosecution, there was no prejudice because defense counsel raised this issue in closing argument, and the judge instructed the jury on the principles applicable to accomplice testimony. Moreover, Petitioner's fingerprints at the crime scene and the consistency of McEachin's testimony with the physical evidence is strong evidence of his guilt that would not have been overcome by asking McEachin if his testimony was fabricated based on fear of being charged with the murder. Therefore, there is no *Strickland* prejudice for trial counsel's failure to cross-examine McEachin on this issue, and Petitioner cannot establish cause and prejudice to excuse procedural default of this claim. Ground One of the Petition is denied.

Ground Eleven:  <u>Trial counsel was ineffective when he failed to poll the individual jurors before the death sentence was recorded</u>.

In Ground Eleven of the petition, Petitioner asserts his trial counsel was ineffective for failing to poll the jurors before the death sentence was recorded.  (Pet., ECF No. 1-1, ¶¶89-93.)  At the penalty phase of trial, defense counsel did not request that the court poll the jurors.  (*Id.*, ¶90.)  Petitioner asserts he was prejudiced because the jury may have been confused on whether any mitigating circumstance had to be found by a unanimous verdict and without polling the jury, such an error could not be rectified.  (*Id.*, ¶¶91-92.)

Respondents contend this claim has no merit.  (Respondents' Brief, ECF No. 105 at 193.)  The PCRA court denied the claim because it found no *Strickland* prejudice, finding the penalty-phase jury instructions were proper, and each individual juror signed the verdict sheet, indicating the jury's death sentence was unanimous.  (*Id.*)  The verdict sheet indicated the jury unanimously found there were no mitigating circumstances, demonstrating there was no prejudice for failing to poll the jury.  (*Id.*)  The Pennsylvania Supreme Court on PCRA appeal agreed that signatures of all jurors on the verdict form evinced a lack of *Strickland* prejudice, but it remanded because Petitioner was not given notice of the PCRA court's reason for dismissing the claim, and giving him an opportunity to amend his petition, presumably to overcome the lack of prejudice.  (*Id.* at 194.)  Petitioner does not provide any basis to believe that if his counsel had polled the jurors, he would have discovered that one of them found a mitigating circumstance.  (*Id.*)

Respondents argue there is no prejudice here for the same reasons the jury instruction claim in Ground Ten lacks merit.  (*Id.*)  The trial court instructions were clear, the verdict form was unremarkable, and the Court Crier's question does not make prejudice any more likely.  (*Id.*)  In sum, Respondents argue, "[w]here the jury found unanimously that there were no mitigators and

affixed their signatures to the sheet so stating, especially after an instruction explicitly clarifying the *Mills* point, there is no possible prejudice from counsel's deciding not to poll the jury." (*Id.*)

Here, the record shows that after the jury announced it had agreed on two aggravating circumstances, the court crier asked, "Have you agreed on any mitigating circumstances?" (Respondents' Brief, Ex. N, ECF No. 105-59 at 76.) The foreperson answered, "No we have not." (*Id.*) However, as discussed in Ground Ten above, the jury's indication on the verdict sheet that it unanimously found no mitigating circumstances[30] precludes any finding that defense counsel was ineffective for failing to poll the jury on the issue because if the jury was unanimous as to no mitigating factors, then no single juror found a mitigating factor. *See Hackett*, 381 F.3d at 298 (where the verdict form indicated "the jury 'found unanimously at least one aggravating circumstance and no mitigating circumstances'" there was no "Mills/Boyde violation" because "no juror found that there was any mitigating circumstance.") Petitioner has not shown prejudice to excuse procedural default of this claim. Therefore, the Court dismisses Ground Eleven of the petition.

IV.    <u>CONCLUSION</u>

For the reasons discussed above, the Court reserves decision on Ground Nine of the petition pending an evidentiary hearing to develop the factual basis for the claim; and the Court denies the remainder of the petition in its entirety.


Date:  August 1, 2018

s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
United States District Judge

---

[30] (Petr's Mem., ECF No. 87-6 at 66.)